## PASSANTINO et al. v. UNITED STATES.

Circuit Court of Appeals, Eighth Circuit.
April 1, 1929.

No. 8178.

Harry L. Donnelly, of Kansas City, Mo., for plaintiffs in error.

Roscoe C. Van Valkenburgh, Asst. U. S. Atty., of Kansas City, Mo. (Roscoe C. Patterson, U. S. Atty., of Kansas City, Mo., on the brief).

Before KENYON, Circuit Judge, and JOHNSON and McDERMOTT, District Judges.

JOHNSON, District Judge. ▇ Charles Passantino and William Collins were convicted in the court below on an information charging them with the sale of a half pint of intoxicating liquor to Walter E. Payne, a prohibition officer, on or about the 19th day of May, 1927. The defendant Collins has assigned as error the refusal of the trial court to give certain instructions requested by him. It appears from the record that the court gave all his requested instructions in substance except one; that one was in respect of the so-called defense of alibi. Testifying in his own behalf, the defendant Collins said he did not remember where he was at 1:30 o'clock on the afternoon of the 19th of May, 1927, the time the witness Payne had testified he received the half pint of liquor from Collins. This testimony did not present the defense of alibi, and for that reason there was no error in the refusal of the trial court to give the instruction requested by the defendant Collins relating to alibi.

The judgment as to the defendant Collins will be affirmed.

▇ As to the defendant Passantino it must be reversed, as we shall see.

The trial court gave in substance the instruction relating to alibi requested by the defendant Passantino, an instruction he was entitled to under the evidence. The defendant Passantino testified that he was engaged in the business of furnishing automobiles for use at funerals; that from about 1 o'clock to about 4 o'clock during the afternoon of the 19th of May, 1927, he was out with one of his cars attending the funeral of a Mrs. Levy and was not at the soft drink place referred to by Mr. Payne in his testimony at 1:30 o'clock on the afternoon of the 19th of May, 1927, and knew nothing of the transaction detailed by him. The testimony of Passantino was corroborated by the testimony of Archie Louis, one of the undertakers in charge of the funeral of Mrs. Levy. He testified in substance that Passantino, the de-

fendant, was attending the funeral of Mrs. Levy with one of his cars from about 1 o'clock to about 3 o'clock on the afternoon of May 19, 1927. In rebuttal of the testimony of the defendant Passantino and of Archie Louis, the undertaker, the prosecution was permitted to put in evidence a copy of the death certificate and burial record of Mrs. Levy kept in the office of the bureau of vital statistics and health department of Kansas City, which record over the signature of J. P. Louis, undertaker, gave the date of the burial of Mrs. Levy as May 18, 1927. Miss Collins, the clerk in the office of the bureau of vital statistics and health department of Kansas City, testified that the original record, signed by the attending physician and the undertaker J. P. Louis, had been sent by her to the office of the state board of health at Jefferson City, but before forwarding the original record she had made for her office the copy received in evidence. This copy she said was an exact copy of the original. Archie Louis, son and associate with his father J. P. Louis in the undertaking business, was recalled in surrebuttal, and testified in substance that burial permits were always obtained before interment and that the original record referred to by Miss Collins was signed by his father before the funeral; that it had been the intention to bury Mrs. Levy on the 18th, but after the record in question had been signed by his father and the burial permit issued, the date of the funeral had been changed to the 19th. This death and burial record went to the jury as evidence in the case without comment or explanation by the court. The admission of the copy was objected to on the ground that it was not certified as required by statute.

The statutes of Missouri make certified copies of death records prima facie evidence of the facts therein stated.

The Supreme Court of Missouri, in Carp v. Queen Ins. Co., 203 Mo. 295, 104 S. W. 78, in discussing another statute of like import, has said, "It was not the purpose of this statute to exclude original instruments which had been properly identified as such," that is to say, the statutory method of making proof by certified copies is not exclusive. At common law examined copies of public records are admissible in evidence, as appears from the authorities cited and collated in 22 C. J. §§ 936 and 943. The Supreme Court of the State of Missouri has never held, so far as we are advised, that this common-law rule is not in force in that state, and we are not inclined to do so in the absence of such a holding.

The case could be disposed of on this point if it did not appear upon the face of the record that the defendant was probably seriously prejudiced by the death record above referred to going to the jury as evidence of the date of burial of Mrs. Levy.

As already said, the statutes of Missouri make certified or authenticated copies of death records presumptive or prima facie evidence of the facts therein stated. The copy of the death record received in evidence in this case in lieu of a certified copy gave May 18th as the date of the burial of Mrs. Levy. The defendant Passantino and the undertaker in charge both testified positively that the burial was on the 19th, the undertaker explaining how it came about that the recital of the death record was erroneous. In view of this testimony the question is: What probative value did the death record have? Wigmore on Evidence, vol. 4, § 2491, p. 3534, discussing presumptive or prima facie evidence, says:

"Nevertheless, it must be kept in mind that the peculiar effect of a presumption 'of law' (that is, the real presumption) is merely to invoke a rule of law compelling the jury to reach the conclusion *in the absence of evidence to the contrary* from the opponent. If the opponent does offer evidence to the contrary (sufficient to satisfy the judge's requirement of some evidence), the presumption disappears as a rule of law, and the case is in the jury's hands free from any rule." (Italics in text.)

The following is incorporated in the text from Lord Mansfield, reported in 5 Burr, 2686:

" 'This being *prima facie* evidence of a publication by the master himself, it stands good till answered by him; and if not answered at all, it thereby becomes conclusive so far as to be sufficient to convict him * * *. (It) must stand *till* contradicted or explained or exculpated by some other evidence, and if not contradicted, explained, or exculpated, would be in point of evidence sufficient or tantamount to conclusive * * * If it be sufficient in point of law, and the juryman believes it (i. e. the fact of purchase), he is bound in conscience to give his verdict according to it;' Mr. Justice *Aston* 'laid down the same maxim as being fully and clearly established, "that *prima facie* evidence (if believed) is binding *till* contrary evidence be produced." ' " (Italics in text.)

Continuing, Prof. Wigmore says:

"It is therefore a fallacy to attribute (as do some judges) an artificial probative force to a presumption, increasing for the jury the

118

weight of the facts, even when the opponent has come forward with some evidence to the contrary. For example, if death be the issue, and the fact of absence for seven years unheard from be conceded, but the opponent offers evidence that the absentee, before leaving, proclaimed his intention of staying away for ten years, until a prosecution for crime was barred, this satisfies the opponent's duty of producing evidence, removing the rule of law; and when the case goes to the jury, they are at liberty to give any probative force they think fit to the fact of absence for seven years unheard from. It is not weighed down with any artificial additional probative effect; they may estimate it for just such intrinsic effect as it seems to have under all the circumstances"—citing and quoting in the footnotes the opinion of Judge Sharpe in Alabama G. S. R. Co. v. Taylor, 129 Ala. 238, 29 So. 673.

In Toledo, St. L. & W. R. R. v. Star Flouring Mills Co., 146 F. page 960, the Sixth Circuit Court of Appeals, speaking through Lurton, Judge, afterwards Justice of the Supreme Court, quoted with approval from an Ohio case (Klunk v. Hocking Valley Ry. Co., 74 Ohio St. 125, 77 N. E. 752) as follows:

"To rebut or destroy a mere prima facie case, the party upon whom the burden rests of repelling its effect, need only to produce such amount or degree of proof as will countervail the presumption therefrom. In other words, it is sufficient if the evidence offered for that purpose counter-balance the evidence by which the prima facie case is made out and established. It need not overbalance or outweigh it."

It is obvious that the testimony of Archie Louis, the undertaker, counterbalanced the prima facie case arising from the recital of the date of the funeral of Mrs. Levy contained in the death record. In the face of his testimony the recital of the death record, under the authorities, was without probative value and should not have been received in rebuttal as evidence tending to prove, prima facie or otherwise, the date of the burial of Mrs. Levy, or if received because of the ground of the objection to it, the jury should have been advised that the death record had no probative value in view of the testimony of the undertaker. No request for such an instruction having been made, we should not reverse the case unless it is probable the jury was led to convict the defendant because of the recital of the date of the burial of Mrs. Levy contained in the death record in evidence before them. If the defendant was out with his car attending the funeral of Mrs. Levy at 1:30 p. m. of May 19th, and according to the testimony of the defendant Passantino and the undertaker such was the fact, it is evident that Mr. Payne, the government witness, was mistaken as to the identity of the party whom he paid for the liquor received from the defendant Collins, if he made the purchase at the time he said he made it. His testimony in substance was that on the 19th of May, 1927, at about 1:30 in the afternoon he went into the soft drink place at 217 East Eighth street in Kansas City; that the defendant Passantino was sitting in a chair with the back in front of him; the defendant Collins and others were sitting around tables. "I went," he said, "to Charley Passantino and said: 'You know, Fat, I want to get half a pint of whiskey.' He looked at me. I said, 'Well, come on, hurry up, because I have got to be—' I think I told him over in Kansas—'in a few minutes and I am late now and I went (want) to get it and go." And then he got up out of the chair, walked around and as he walked around behind the bar, I also walked from where I was down in front of him up to the front of the bar and stood there, and by that time Collins had left the table where he was—at which he was sitting back there, came up to the right side of me, reached in his hip pocket, pulled out half a pint of whiskey; handed it to me; I put it in my pocket and gave Passantino, who then was directly behind the bar directly in front of me, right even with the cash register—he just had turned around —I gave him a dollar bill and he turned around, put his fingers like this up on the cash register (indicating), hesitated a minute, finally rang up the sale which registered seventy-five cents. Then he gave me back my quarter and I left the place."

On cross-examination he stated that this was the first time he ever saw Charley Passantino to know who he was, and added: "If I had seen him I wouldn't know who he was when I did see him." About a week later he, with another government agent, returned to the place with a search warrant, at which time he identified the defendant Passantino and Collins as the men from whom he had secured the liquor on the 19th. It appeared from the evidence of the defendant Passantino that the building in which the soft drink place was located was held by him and his two brothers, Rosario and George, in some sort of joint ownership. George had the first floor of the building except an office in the rear occupied by Charles and sometimes by Rosario also; the soft drink place belonged

to George. Charles with his family occupied the second floor as a residence, and Rosario the third floor as a residence. Charles and Rosario testified as witnesses in the case; George was not present at the trial. It does not appear that Mr. Payne knew or had ever seen George.

In view of the fact·that Charles had no interest in the soft drink business and the fact that the witness Payne said that he did not know Charles prior to the 19th, and the further fact that he had (so far as the record shows) never seen George or sought him out for the purpose of checking against his identification of Charles as the party to whom he paid the money on the 19th for the liquor delivered by Collins, it may well be that the jury might have had a reasonable doubt as to the correctness of his identification of Charles as the party with whom he did the business on the 19th, if the burial record of Mrs. Levy had not been before them as substantive evidence tending to show that the undertaker Louis and the defendant Passantino were swearing falsely as to the date of the funeral of Mrs. Levy. Especially is this true in view of the instruction of the court to the effect that:

"If you believe any witness has wilfully sworn falsely, you are at liberty to disregard the whole, or any portion of that witness' testimony, and will give to the testimony of such witness just what weight and value you believe it is entitled to receive."

Doubtless government counsel argued to the jury that this death record showed that both the undertaker and the defendant Passantino had perjured themselves, an argument without justification either in law or fact.

The judgment will be reversed as to the defendant Passantino, and affirmed as to the defendant Collins.