**Wanda Eloise LUPO, Appellant,**

v.

**UNITED STATES of America,**
**Appellee.**

**No. 18359.**

United States Court of Appeals
Ninth Circuit.

Sept. 17, 1963.

Kay & Miller, Anchorage, Alaska, for appellant.

Warren C. Colver, U. S. Atty., and James R. Clouse, Jr., Asst. U. S. Atty., Anchorage, Alaska, for appellee.

Before BARNES, HAMLEY and JERTBERG, Circuit Judges.

HAMLEY, Circuit Judge.

Wanda Eloise Lupo appeals from her conviction and sentence on all counts of a three-count indictment charging violations of the false statement statute, 18 U.S.C. § 1001. She argues that hearsay testimony was erroneously received, cross-examination of a Government witness was improperly restricted, and the jury verdicts are not supported by substantial evidence.

Mrs. Lupo's conviction arose out of transactions involving the sale of two houses in Anchorage, Alaska, in which transactions she served as a real estate broker. Both purchases, one by Mr. and Mrs. John R. Gensel from Mr. and Mrs. Alfred Martin Bergstrom, and the other by George J. Jenkins from Mr. and Mrs. Otis W. Grubbs, were financed by means of direct loans made by the United States Veterans Administration.

Count I of the indictment involves the Gensel purchase. It is therein charged that for the purpose of securing a loan from the Veterans Administration Mrs. Lupo caused to be made and used an earnest money receipt which reflected a total sale price of $9,500, whereas the actual total price was $10,000. Counts II and III involve the Jenkins purchase, one referring to an earnest money receipt and the other to a pre-closure report and loan-proceeds request which Mrs. Lupo assertedly caused to be made and used. In each of these documents a sale price of $10,600 was reflected whereas the actual total price, according to the indictment, was $12,750.

According to evidence offered by the Government, the lesser of these figures, in each case, accorded with the reasonable value established for these properties by the Veterans Administration, and the loans would not have been made at the higher figures. The Government also submitted evidence to the effect that in the Gensel transaction, the difference between the $9,500 price stated in the earnest money receipt and the $10,000 actual price was covered by a side promissory note in the sum of $500.00 which the Gensels gave the Bergstroms, of which note the Veterans Administration had no knowledge.

As to the Jenkins transaction, the Government produced evidence to the effect that, contrary to a statement in the earnest money receipt, a down payment of $600.00 had not been made. There was also Government evidence to indicate that this $600.00, together with the $2,150 difference between the purported and actual purchase price, was covered by a side promissory note in the amount of $2,750, secured by a second mortgage from Jenkins to the Grubbs, of which note and mortgage the agency had no knowledge

With respect to both the Gensel and Jenkins transactions, it was Mrs. Lupo's position that the documents delivered to the Veterans Administration reflected the actual total purchase price, and that the side notes were given in connection with the purchase of personal property acquired at the same time. She produced evidence tending to prove her version of the transactions. Needless to say, the

jury verdicts of guilty on each count reflect jury acceptance of the Government testimony and rejection of that offered by Mrs. Lupo.

With regard to the hearsay question, appellant calls attention to that part of the Government's examination of its witness, Otis W. Grubbs, which is quoted in the margin.[1]

The question which led to the only objection which was made was: "Who gave you those instructions, sir?" But, considered in context with the immediately preceding testimony, this question was really: "Who instructed you and Mrs. Grubbs that you would have to take a second mortgage for $2,750, the remaining $10,000 to come through the Veterans Administration loan?" Such a question does not call for hearsay, because the answer does not involve disclosure of an out-of-court statement.

But the answer given, to the effect that Mrs. Lupo had so instructed Mrs. Grubbs, disclosed that Grubbs' earlier testimony that Mrs. Lupo had given the Grubbs such an instruction was based on hearsay information he had received from his wife. The proper course for appellant's trial counsel, under these circumstances, was to move that this prior testimony be stricken as hearsay. No such motion was made, however, but only the observation that "I am going to have to object to any further answers. * * *"

As indicated by the testimony quoted in the margin, counsel for the Government thereafter asked Grubbs a question

---

1. "Q. Can you explain why the sale price was listed at ten-six on that document when in fact it was twelve-thousand-seven-en-hundred-and-fifty?

"A. Well, it is a little difficult to explain. According to our instructions we would have to take a second mortgage for $2750.00, and we would get ten thousand through the V. A. loan; but the ten-six I can't explain.

"Q. Who gave you those instructions, sir?

"A. Well, actually Mrs. Lupo gave them to my wife, and my wife told me the details, and she wrote me the details of the sale, and she was very anxious to——

"MR. MAFFEI: Your Honor, I am going to have to object to any further answers. If he obtained the information through his wife, it would be completely hearsay.

"THE COURT: There is a problem. There is a well-known exception to the hearsay rule, however, as to matters which are part of the res gestae which influence action or nonaction. I believe it comes within that. However, there is another problem here. He is referring to a letter. All statements which are the contents of a letter would not be the best evidence. Do you have the letter?

"A. No; I don't have the letter.

"THE COURT: Where is it?

"A. Well, sir, it has been several years ago so——

"THE COURT: You didn't keep it?

"A. No.

"THE COURT: I think this comes within the exception, and I will overrule the objection.

"Q. (By Mr. Clouse) Mr. Grubbs, as a result of this correspondence from your wife did you sign—was there a mortgage that you know of, a second mortgage for this property?

"A. Yes; about ten months later, I guess it was.

"Q. And who was this mortgage executed by, sir, and signed by?

"A. George and Jennie Jenkins.

"Q. During most of this transaction, Mr. Grubbs, where were you, sir?

"A. Well, most of the time I was at McGrath, and in February I came through on my way to Annette, and at that time I must have signed this, or it was sent to me blank or something.

"Q. When you came through on your way to Annette from McGrath, did you meet and discuss the transaction with Mrs. Lupo with your wife?

"A. Yes.

"Q. And what was the discussion at that time? What did it center around? What was the nature of it?

"A. Well, the discussion was still on the same line, that we would have to relinquish all rights to the Veterans and then take a second mortgage for the balance.

"Q. Whose suggestion or instructions was it that you sign or take a second mortgage on this property?

"A. That was between my wife and Mrs. Lupo, and we also talked about it when I came through too.

"Q. And who suggested the second mortgage to you and your wife?

"A. Well, Mrs. Lupo talked it over with my wife, and, as I say, when I came through it was discussed."

which led to further hearsay testimony. After first having Grubbs testify that he had discussed with his wife the nature of the transaction with Mrs. Lupo, counsel for the Government had Grubbs state, on the basis of his conversation with Mrs. Grubbs, the instructions which Mrs. Lupo had given her. Trial counsel for appellant did not object to this line of questions, but perhaps he was justified in withholding further objection in view of the prior ruling that such testimony is admissible as "part of the res gestae." In our opinion, this evidence was not admissible under that exception to the hearsay rule, Grubbs' conversation with his wife being separate and apart from Mrs. Lupo's dealings with Mrs. Grubbs.

■ But this hearsay testimony could not have prejudiced Mrs. Lupo. She herself testified that she completed this loan transaction, supplied the information for preparation of the $2,750 second mortgage, requested her attorney to prepare it, notarized the instrument after the Jenkins signed it in her office, and delivered the instrument to the bank along with escrow instructions concerning it which she had prepared. The fact that Mrs. Lupo had instructed the Grubbs to take a second mortgage was thereby established by her own testimony.

We therefore hold that the reception of this hearsay testimony did not constitute prejudicial error.

■ In contending that the trial court improperly restricted defense counsel's cross-examination of a Government witness, appellant points to that part of the cross-examination of Daniel I. Donovan quoted in the margin.[2] She argues that this line of questioning was for the purpose of attacking the credibility of Mrs. Gensel, who testified for the Government, by showing a possible motive for her asserted hostility to Mrs. Lupo.

We need not decide whether it would have been proper for Mrs. Lupo to place in evidence, for impeaching purposes, documents contained in the agency file of which Donovan had immediate custody. No such documents were offered. The question objected to called upon this Government official to state whether it appeared from the agency file that the Veterans Administration was having "trouble" collecting from Mrs. Gensel. Such testimony would have been improper both on the grounds of hearsay, and as calling for the expression of an opinion.

In our opinion, the trial court did not err in sustaining the objection to this question.

Finally, appellant argues that the verdicts of the jury as to all counts of the indictment are contrary to the weight of the evidence and are not supported by substantial evidence.

■ Appellant did not, as to any of these counts, move for judgment of acquittal at the close of all the evidence, as provided in Rule 29, Federal Rules of

2. "Q. But there is substantial correspondence with Mrs. Gensel, is there not?

"A. There is indirect correspondence in the form of a report which indicates that Mrs. Gensel called on Mr. Bredik here in Anchorage, who was a V.A. contact representative, and discussed the case with him, and he then filed a report which was placed in the file.

"Q. All right. Does it appear from the file that the Veterans Administration was having some trouble collecting from Mrs. Gensel?

"MR. CLOUSE: Your Honor, I would object to the question. I don't again see the materiality of such examination to the charge in the trial of this matter.

"THE COURT: I can't see where that would be material or relevant.

"MR. MAFFEI: Well, it would certainly show the frame of mind of Mrs. Gensel and the frame of mind that she had in testifying in this court, I think, your Honor.

"THE COURT: To impeach her testimony, that would not be the way to do it.

"MR. MAFFEI: Pardon me?

"THE COURT: If you were seeking to impeach Mrs. Gensel, that wouldn't be the proper method.

"MR. CLOUSE: I might also point out that it would be her attitude toward the Veterans Administration and not the defendant.

Criminal Procedure. For this reason she may not now question the sufficiency of the evidence to support the verdicts rendered. Hardwick v. United States, 9 Cir., 296 F.2d 24.

The judgment is affirmed.

"THE COURT: After the loan was consummated? It would not be relevant here; nor would this report from Mr. Bredik be competent—it would be hearsay, a report to the Veterans. But you haven't offered it."