UNITED STATES of America, Plaintiff-Appellee,

v.

Richard T. GOSSER, Defendant-Appellant.

UNITED STATES of America, Plaintiff-Appellee,

v.

Donald J. PINCIOTTI, Defendant-Appellant.

UNITED STATES of America, Plaintiff-Appellee,

v.

Ted MAISON, Defendant-Appellant.

Nos. 15415–15417.

United States Court of Appeals Sixth Circuit.

Dec. 8, 1964.

Merritt W. Green, Toledo, Ohio, and Fred H. Mandel, Cleveland, Ohio, for appellant Gosser.

Henry C. Lavine, Cleveland, Ohio, for appellant Pinciotti.

Marcus L. Friedman, Toledo, Ohio, for appellant Maison.

William S. Lynch, Department of Justice, Washington, D. C., and John G. Mattimoe, Asst. U. S. Atty., Toledo, Ohio, Merle M. McCurdy, U. S. Atty., Cleveland, Ohio, on brief, Jacob B. Tanzer, Department of Justice, Washington, D. C., of counsel, for appellee.

Jack Gallon, Gerald B. Lackey, Robert Z. Kaplan, Allan J. Chabler, Toledo, Ohio, amici curiæ, Toledo & Northwestern Ohio Civil Liberties Union.

Before MILLER, O'SULLIVAN and PHILLIPS, Circuit Judges.

SHACKELFORD MILLER, Jr., Circuit Judge.

The defendants-appellants, Richard T. Gosser, Donald J. Pinciotti, and Ted Maison, were indicted for conspiring during the period of October 5, 1962,

through November 12, 1962, to defraud the United States, in violation of Section 371, Title 18 United States Code. The indictment specifically charged that the defendants, together with Mrs. Patricia Niedomski, who was an employee of the United States, assigned to the Intelligence Division of the Internal Revenue Service, and who had access to the confidential files of said Intelligence Division, conspired that Mrs. Niedomski would make available to the defendants certain documents and transcriptions thereof, surreptitiously taken by her from the files of the Internal Revenue Service, pertaining to the investigation by said Service of the income tax returns of the defendant Gosser. Mrs. Niedomski was named as a conspirator but was not made a defendant. Following a trial of approximately 9 days, the jury returned a verdict of guilty against each defendant. Each defendant received a sentence of three years. These separate appeals followed, which have been heard together. In view of the strong reliance by the appellants Gosser and Pinciotti upon the defense of entrapment, we will state the evidence in some detail.

The Government's evidence showed the following. Patricia Niedomski was an employee in the Toledo, Ohio, office of the Internal Revenue Service, Intelligence Division. The defendant Ted Maison, who was married to her first cousin, was in the numbers business. The defendant Gosser was the senior International Vice President of the United Autmobile Workers of America, AFL–CIO. The defendant Pinciotti was an employee of the International Union of the United Automobile Workers of America, and by assignment of the International Union was an Administrative Assistant to Gosser.

The Internal Revenue Service had some time prior to October 1962 instituted an inquiry and investigation of the income tax returns of Gosser for the years 1956, 1957, and 1958. These claims were subsequently settled without fraud penalties.

On October 19, 1962, an agent of the Toledo Treasury Intelligence Office noticed that Mrs. Niedomski was engaged in typing from reports which were not in her particular area of responsibility. From October 22 through November 1 Mrs. Niedomski was from time to time under surveillance by various government agents. On November 2 she was questioned by three agents and accused of giving Maison information from the files of the Intelligence Division. After extended questioning she finally admitted that she had been furnishing Maison with such information. Thereupon, the agents accompanied Mrs. Niedomski to her home, where they recovered two stenographic notebooks and six other documents, including copies of four sensitive case reports relating to a Treasury Intelligence investigation which had been conducted on Gosser for the years 1956, 1957, and 1958.

Mrs. Niedomski testified that during June or July 1962 she furnished Maison with a copy of some information taken by her without authority from the government files, the exact nature of which she did not remember; that about the end of September 1962 she gave Maison a copy of a memorandum relating to gambling at the Willys Overland plant in Toledo, which involved Maison's brother, which she had copied without authority; then on October 5, 1962, she met Maison at a bowling alley where he handed her an envelope containing $50.00, which was for the memorandum which she had given him regarding gambling activities at the Willys Overland plant; that at that time Maison asked her if she would like to make some extra money, and when she asked him in what way, Maison said "getting information on the Richard T. Gosser case"; that a little later in the evening when she was leaving, Maison began to converse with her about Gosser and Pinciotti and said that the papers he wanted her to get was "any information at all relating to the Richard T. Gosser case" and that Gosser "would be interested to know who the informant was"; that on October 12, 1962, she

again saw Maison at the Elm Recreation Bowling Alley, conversed with him and gave him some papers, the nature of which she did not recall; told him that she had typed a final report on the Richard T. Gosser case, that Maison asked her to get him a copy of it, and that she told him she would; that on the evening of October 19, 1962, she met Maison again and gave him a copy of a memorandum relating to Mr. Gross, which was in connection with the Richard T. Gosser case; that at that time Maison gave her $50.00 and asked her to get him a copy of the final report, and that she told him she wouldn't be able to; that she next saw Maison on October 26, 1962, at the Elm Recreation Bowling Alley, at which time she gave him a copy of the reports on the Richard T. Gosser case, that Maison slipped some currency in her purse, which amounted to $50.00; that on October 22 Maison called her and gave her some names to check on; that on October 29, 1962, Maison called her and gave her some additional names to check on, and told her "they were very well pleased with the information."

Two government agents also testified that they observed the meeting between Mrs. Niedomski and Maison on October 26 and saw her give certain papers to him while they were seated together at the bar. This was during the time Mrs. Niedomski was under surveillance beginning October 22. Mrs. Niedomski's testimony about these meetings with Maison was not contradicted by him, who did not take the witness stand. Mrs. Niedomski did not know either Gosser or Pinciotti.

Despite the mandatory provisions of Section 7214, Title 26 United States Code, requiring the discharge of a government employee who discloses such information, Mrs. Niedomski was not discharged. She returned to work on Monday, November 5, and attended to her regular duties except for an hour or so each day spent in conference with government inspectors. At these meetings plans were made for her to arrange a meeting with Maison for the following Friday, November 9. On November 8 she phoned Maison, asked him if he was going to be bowling Friday night, and upon his saying that he was, she told him "I'll see you then."

At about 9:15 P.M. on the evening of November 9 Mrs. Niedomski came to the Federal Building parking lot where she met two government agents and two girls, who searched her person and made inventory of the contents of her purse. There was a wallet in it which contained $63.00. One of the government agents handed her some documents which she read and put in her purse. These were copies of the reports relating to the Richard Gosser case which had been found in her home. They had been dusted with fluorescent material, some of which was also inside the envelope in which the documents were placed. Mrs. Niedomski drove to the Elm Recreation Bowling Alley, followed by the agents. She watched Maison bowl for a while. After he finished bowling he came out to the bar and sat next to her, at which time she gave him the documents. He read them and put them in his pocket. She told him to please be careful and that she had to know what was going to happen to this information. Maison said he would call Pinciotti Sunday evening and tell him to meet him for a cup of coffee. She asked him what time they were going to meet. He told her Monday morning at 9:30 at the International Pancake House. Maison put $50.00 in her purse which was later turned over to a government agent. Mrs. Niedomski left the bowling alley at 11:15 P.M. and returned to the Federal Building parking lot where her person and the contents of her purse were again searched and she made an affidavit as to the occurrences that evening. Her wallet contained $61.00 and there was $50.00 in loose money in her purse. No papers were found in her purse.

At approximately 9 A.M. on November 12 Maison entered the Pancake House in Toledo, where shortly thereafter he was joined at the table by Pinciotti. Maison handed Pinciotti a large, white

letter-size envelope which he withdrew from his pocket. Pinciotti withdrew the documents from the envelope and looked at them very carefully, turning the pages, for approximately ten minutes. He then placed them in his pocket and left the Pancake House. These acts were observed by two government agents who were seated nearby in the Pancake House. A government employee who had made the copies of the documents in question was seated approximately ten feet away and recognized the documents as the copies she had made by reason of the format of the papers and the fact that some of the columns under the forms filed were out of line.

After leaving the Pancake House Pinciotti went to the United Automobile Workers' Health and Retiree Center near the center of downtown Toledo where Gosser maintained his offices and where Pinciotti also had an office. A warrant was obtained for Pinciotti's arrest. At approximately 5:00 P.M. Federal officers entered a small office in the Retiree Center in which Gosser, Pinciotti and a man named Scott were seated. Pinciotti and Scott were seated on chairs near the door. Gosser was seated behind the desk. One of the officers stated to Pinciotti that he was being placed under arrest and he was taken into custody, although the officer at that time did not have the physical possession of the warrant. Rule 4(c) (3), Rules of Criminal Procedure. Pinciotti was searched but the documents were not found on his person. The officers then started to search the office, as a search incidental to the arrest, but were stopped by Gosser who said, "This is my room and you're not going to search it without a warrant." The arrest warrant and a search warrant arrived shortly thereafter and the office was searched. They found some papers on top of the desk, which were not the papers herein involved. They asked Gosser if he knew anything about the papers named in the search warrant and he said that he didn't have them and knew nothing about them. The envelope containing the documents was found very

shortly thereafter in the middle drawer of the desk. The documents were identified as the ones placed in Mrs. Niedomski's purse in the Federal Building parking lot on the previous Friday, November 9. Fluorescent material was in the envelope and traces of fluorescent glow were found on Pinciotti's hands. No such glow was found on Gosser's hands.

Pinciotti testified that he had known Maison only casually from some time in 1961, had met him only infrequently, and joined Maison at the Pancake House on the morning of November 12 by reason of a telephone call about 8:30 that morning from Maison suggesting that they get together at the Pancake House. He agreed, but upon joining Maison there he remembered that he had a meeting to attend and stayed only five or six minutes, long enough to have a cup of coffee. He stated that Maison handed him two envelopes, that he opened one of them, glanced through the papers for a second or two, noticed that they were a coin collection monthly report and a professional football schedule, and put them back in the envelope. He stated that he was a former professional football player, that collecting coins was one of his hobbies, that Maison was a dealer in coins, but that he had never been to Maison's coin shop or bought any coins from him. The coin collection data and football schedules were not produced or offered in evidence. He said that he did not look at the papers in the other envelope, and did not know what the envelope contained; that he put the two envelopes and other papers which he had on the automobile seat, took them to his office when he reached the Health and Retiree Center and placed them on the top of his desk as he left to attend a meeting. He was very busy with his work the rest of the day, which concluded with the meeting in his office with Gosser and Scott, at which he was arrested. He testified that the meeting with Scott had been arranged by him because Gosser wanted to talk to Scott about some whiskey Scott was donating to a coming bazaar. No explanation was given by

Pinciotti, Gosser or any witness about how the papers in question were transferred from the top of the desk to the drawer of the desk.

Pinciotti admitted on cross-examination that he was "somewhat aware" that there was an Internal Revenue Service investigation of the tax affairs of Gosser, although he didn't "know a heck of a lot," and after denying that he aided Gosser in any way in regard to the investigation, he admitted that he and some other persons went to Washington, but at no urging by Gosser, to talk to the President about the harassment of Gosser by the Internal Revenue Service; that the President's office referred him to Mr. Caplin; and that the purpose of his visit was that if an investigation was being made, it be completed and the harassment of Gosser be discontinued.

Gosser testified that he did not know either Mrs. Niedomski or Maison; that he did not ask anybody directly or indirectly to get any papers for him from the government files; that he did not touch or accept or receive any of the papers that Mrs. Niedomski testified about; that he was not aware that the papers in question were in the drawer of the desk; and that the entire case was "framed" by the Government to get him. He admitted on cross-examination that he was aware of an investigation that had been pending in the Intelligence Division of the Internal Revenue Service for some time prior to October 1962, his long-time association with Scott, and his presence with Pinciotti and Scott at the meeting where Pinciotti was arrested, and that he refused to let the government officers search the office until the search warrant arrived.

At the close of the Government's case the defendants moved for a directed verdict of acquittal. Gosser and Pinciotti contend that the motion should have been sustained on the ground of entrapment. The District Judge rejected this defense and instructed the jury, "I charge you as a matter of law that the facts of this case do not raise any issue of entrapment and therefore you are not to consider it in your deliberations." Appellants contend (1) that the evidence was sufficient to require that the factual issue be submitted to the jury, and (2) that when the issue of entrapment is raised there are only two courses of action which can be followed, namely, (a) find entrapment as a matter of law and dismiss the indictment, or (b) instruct upon the issue of entrapment and let the jury decide the issue. This contention denies the right of the trial judge to rule as a matter of law, as the District Judge did in the present case, that the evidence is insufficient to constitute entrapment. This issue is briefed at length in separate briefs by these two appellants, with the citation of numerous authorities. We think that the contention is without merit for the following reasons.

The law with respect to entrapment is well stated in Sorrells v. United States, 287 U.S. 435, 53 S.Ct. 210, 77 L.Ed. 413. If the criminal design originates not with the accused, but is conceived in the mind of the government officers, and the accused is by persuasion or inducement lured into the commission of a criminal act, entrapment exists and the Government is estopped by sound public policy from prosecution therefor. But, if the government officers merely afford opportunities or facilities for the commission of the offense, which originates in the mind of the accused, entrapment does not exist and the Government is not barred from prosecution. In keeping with the rule, the Supreme Court expressly recognized that "Artifice and stratagem may be employed to catch those engaged in criminal enterprises. (Cases cited.) The appropriate object of this permitted activity, frequently essential to the enforcement of the law, is to reveal the criminal design; to *expose* the illicit traffic, * * * *the illegal conspiracy*, or other offenses, and thus to disclose the would-be violators of the law." (Emphasis added.) Subsequent decisions of the Supreme Court have applied the rule under varying circumstances, but have not changed it. Sherman v. United States, 356 U.S. 369, 372, 78 S.Ct.

819, 2 L.Ed.2d 848; Masciale v. United States, 356 U.S. 386, 78 S.Ct. 827, 2 L.Ed. 2d 859; Lopez v. United States, 373 U.S. 427, 434–437, 83 S.Ct. 1381, 10 L.Ed.2d 462.

In our opinion, the undisputed facts establish, without question, that entrapment did not exist in the present case. The evidence showed without contradiction that Maison and Mrs. Niedomski were engaged in a conspiracy to obtain illegally copies of confidential documents in the Intelligence Division of the Internal Revenue Service long before the government agents knew about it or entered the case. There was no "manufacturing of crime by law enforcement officials and their agents," which, as pointed out in Lopez v. United States, supra, 373 U.S. 427, 434, 83 S.Ct. 1381, 1385, 10 L. Ed.2d 462, "is far different from the permissible stratagems involved in the detection and prevention of crime." The fact that Mrs. Niedomski was used by the government agents to expose and prove the illegal conspiracy was a permissible artifice or stratagem to catch those who were engaged in the illegal conspiracy. Accordingly, there was no error on the part of the District Judge in overruling the motion for a directed verdict of acquittal based on the ground of entrapment.

This brings us to the second contention of appellant on this issue that, although the District Judge may have been justified in overruling the motion for a directed verdict and submitting the issue of entrapment to the jury, he did not have the right, regardless of how strong the evidence was on the issue, to refuse to submit the issue to the jury and to rule as a matter of law that entrapment did not exist and that the issue was not to be considered by the jury.

We recognize that there are cases relied upon by appellants that have held that the trial judge was correct, after overruling a motion for a directed verdict of acquittal on the ground of entrapment, in submitting the issue to a jury. The factual issues in those cases made the question of entrapment one for the jury. But those cases do not hold that the trial judge may not rule as a matter of law, if the evidence is uncontradicted and such as to sustain such a ruling, that the issue of entrapment does not exist and is not to be considered by the jury. Nor is the ruling in Sherman v. United States, supra, 356 U.S. 369, 78 S.Ct. 819, 2 L.Ed.2d 848, also relied upon by appellants, to that effect. The Court held in that case that it was error to submit the issue to the jury because entrapment was shown by the evidence as a matter of law. The same situation was before this Court in Morales v. United States, 260 F.2d 939, C.A.6th, also relied upon by appellants, in which we held that entrapment was established as a matter of law and the issue should not have been submitted to a jury. Nor do we think that the dicta relied upon by appellants in those two cases should be given the construction urged upon us by appellants.

We also recognize that in Sorrells v. United States, supra, 287 U.S. 435, 53 S.Ct. 210, 77 L.Ed. 413, the Supreme Court reversed the ruling of the District Judge that there was no entrapment as a matter of law and in refusing to submit the issue to the jury, as the District Judge ruled in this case. But the ruling in that case was expressly based upon the ground that the evidence was insufficient to support the ruling (see p. 452, 53 S.Ct. 210) and not upon the ground that the District Judge was not empowered to make such a ruling. It might well be considered an implied recognition of the power to make the ruling.

In support of the ruling of the District Judge there is the well-settled rule in criminal cases that if there is no evidence to support a particular defense, the trial judge is justified in refusing to submit such defense to the jury. Passantino v. United States, 32 F.2d 116, C.A.8th; Percifield v. United States, 241 F.2d 225, 229, C.A.9th. Defendant's theory of the case must have support in the evidence in order to require an instruction as to it. Marson v. United States, 203 F.2d 904, 912, C.A.6th. We think that this rule is

as applicable to the defense of entrapment as it is to any other defense. It has been so held. Shaw v. United States, 151 F.2d 967, 969, C.A.6th; United States v. Di Donna, 276 F.2d 956, C.A. 2nd. The Supreme Court has also indicated its approval of the right of the District Judge to refuse to instruct the jury on the defense of entrapment if the evidence fails to support such a defense. Lopez v. United States, supra, 373 U.S. 427, 436, 83 S.Ct. 1381, 10 L.Ed.2d 462. We find no error on the part of the District Judge in ruling as a matter of law that the defense of entrapment was not an issue in this case.

The appellants also contend in support of their motion for a directed verdict of acquittal, made at the close of the Government's case, that the evidence was insufficient to support a verdict of guilty. That ground was also rejected by the District Judge in overruling the motions. Thereafter, the defendants offered evidence in their own behalf. At the conclusion of all the evidence the motions for judgment of acquittal were not renewed. On this appeal the appellants contend that this ruling of the District Judge was reversible error.

■ It is the settled rule that if a defendant at the close of the Government's case moves for judgment of acquittal on the ground that the evidence is insufficient to support a verdict of guilty, and after the motion is overruled, introduces evidence in his own behalf, he waives his objections to the denial of his motion for judgment of acquittal on that ground. United States v. Calderon, 348 U.S. 160, Note 1, page 164, 75 S.Ct. 186, 99 L.Ed. 202; Gendron v. United States, 295 F.2d 897, 900, C.A.8th; Lupo v. United States, 322 F.2d 569, 572–573, C.A.9th; Benchwick v. United States, 297 F.2d 330, 335, C.A.9th; Jasso v. United States, 290 U.S. 671, 673, C.A.5th, cert. denied, 368 U.S. 858, 82 S.Ct. 97, 7 L.Ed. 2d 55; Corbin v. United States, 253 F.2d 646, 647, C.A.10th; United States v. Aman, 210 F.2d 344, 345–346, C.A.7th; Clark v. United States, 293 F.2d 445, 448, C.A.5th.

■ We recognize that under Rule 52 (b), Rules of Criminal Procedure, plain errors affecting substantial rights may be noticed even though they have not been brought to the attention of the Court. United States v. Cooper, 321 F. 2d 456, 457, C.A.6th. The Court in Corbin v. United States, supra, 253 F.2d 646, C.A.10th, said at page 648 in recognizing this exception, "This is an exceptional power to be sparingly used." See also: Armstrong v. United States, 65 F.2d 853, 856, C.A.10th. In keeping with that rule we have considered appellants' contention and have concluded that it should be denied. The Government's evidence shows very strongly the existence of the conspiracy on the part of Mrs. Niedomski, Maison and Pinciotti. The income tax investigation of Gosser, the fact that the information taken from the government files and turned over to Maison and then to Pinciotti dealt with this investigation, the nature of the relationship between Pinciotti and Gosser, the fact that Pinciotti went to Washington on Gosser's behalf with respect to this investigation, the presence of the papers in the drawer of the desk at which Gosser was seated, and Gosser's statement that the office in which the desk was located was his office, justify the reasonable inference that Pinciotti was procuring this information for Gosser, and tend strongly to link Gosser with this conspiracy. It would be an unreasonable inference to infer that Pinciotti wanted this information for himself rather than for Gosser or that he was doing what he did without authorization by Gosser. This Court said in Poliafico v. United States, 237 F.2d 97, at page 104, cert. denied, 352 U.S. 1025, 77 S.Ct. 590, 1 L.Ed.2d 597, rehearing denied, 353 U.S. 931, 77 S.Ct. 718, 1 L.Ed.2d 725, "Once the existence of a conspiracy is clearly established, slight evidence may be sufficient to connect a defendant with it." See also: Meyers v. United States, 94 F. 2d 433, 444, C.A.6th, cert. denied, 304 U.S. 583, 58 S.Ct. 1059, 82 L.Ed. 1545, rehearing denied, 305 U.S. 670, 59 S. Ct. 59, 83 L.Ed. 434; United States

v. Cohen, 197 F.2d 26, C.A.3rd; Nye & Nissen v. United States, 168 F.2d 846, 852, C.A.9th, affirmed, 336 U.S. 613, 69 S.Ct. 766, 93 L.Ed. 919; Phelps v. United States, 160 F.2d 858, 867, C.A.8th, cert. denied sub nom. Peters v. United States, 334 U.S. 860, 68 S.Ct. 1525, 92 L.Ed. 1780; Isaacs v. United States, 301 F.2d 706, 724–725, C.A.8th, cert. denied, 371 U.S. 818, 83 S.Ct. 32, 9 L.Ed.2d 58.

The appellant Gosser moved to suppress the evidence obtained by the search warrant on the grounds that (1) the affidavit upon which it was based did not establish probable cause, (2) the affidavit was unreliable because based upon hearsay, and (3) the search was improperly conducted during the nighttime. The motion was overruled. Appellant contends that this was prejudicial error.

 Probable cause for the issuance of a search warrant exists where the circumstances before the officer are such as to cause a man of reasonable prudence to believe that an offense is being committed. The Commissioner must exercise his own judgment as to whether the facts in the affidavit constitute probable cause and his determination is conclusive, unless his judgment is arbitrarily exercised. Evans v. United States, 242 F.2d 534, 536, C.A. 6th, cert. denied, 353 U.S. 976, 77 S.Ct. 1059, 1 L.Ed.2d 1137; Merritt v. United States, 249 F.2d 19, 21, C.A.6th. As this Court said in United States v. Eisner, 297 F.2d 595, 597, cert. denied, 369 U.S. 859, 82 S.Ct. 947, 8 L. Ed.2d 17, "In determining what is probable cause, the Commissioner is not called upon to determine whether the offense charged has in fact been committed. He is concerned only with the question whether there is reasonable grounds to believe at the time of the affidavit that the law was being violated on the premises to be searched." The facts stated in an affidavit may be sufficient to establish probable cause, although they may not be sufficient to convince the Commissioner beyond a reasonable doubt that the defendant has committed an offense. In our opinion, there was no abuse of discretion on the part of the District Judge in holding that probable cause existed under the affidavit of Government Agent Albert Follin and in issuing the search warrant based thereupon.

 Appellants' connection that the issuance of the search warrant was invalid because it was based upon hearsay statements contained in the affidavit is answered by the rulings of the Supreme Court in Jones v. United States, 362 U.S. 257, 80 S.Ct. 725, 4 L.Ed.2d 697, and Rugendorf v. United States, 376 U.S. 528, 533, 84 S.Ct. 825, 11 L.Ed.2d 887, rehearing denied, 377 U.S. 940, 84 S.Ct. 1330, 12 L.Ed.2d 303. The Court ruled in those cases that hearsay alone does not render an affidavit insufficient so long as there is a substantial basis for crediting the hearsay. The present case comes within that rule.

 The evidence shows that the search under the warrant was made 9 minutes after sunset pursuant to a daytime search warrant. Appellant contends that this was contrary to the provisions of Rule 41(c), Rules of Criminal Procedure, which require that the warrant be served in the daytime. This Court held in United States v. Woodson, 303 F.2d 49, 51–52, cert. denied, Gant v. United States, 373 U.S. 941, 83 S.Ct. 1548, 10 L.Ed.2d 696, "Daytime does not in law or by common understanding, begin at sunrise or end at sunset, but includes dawn at the one end and twilight at the other. The practical test given by the ancient authorities is the existence of sufficient light from the sun to recognize a man's features." See also: Sasser v. United States, 227 F.2d 358, 359, C.A. 5th; Atlanta Enterprises v. Crawford, 22 F.2d 834, 837, N.D.Ga.; United States v. Liebrich, 55 F.2d 341, 343, M.D.Pa.

Accordingly, we find no merit in appellant's contention that the District Judge erred in overruling the motion to suppress.

The Government, in its cross-examination of a character witness, Msgr. Doyle, introduced by Gosser, asked the witness

these questions, "In discussing Mr. Gosser's reputation with the people with whom you have discussed his reputation, have you ever discussed the fact of his association with one Neufio Scott, who is a convicted felon and a gambler?" Also, "In discussing the fact of Mr. Gosser's reputation with people with whom you have discussed his reputation, have you heard that Mr. Gosser had been convicted, or rather pled guilty to a charge of robbery on the Dixie Highway in 1921?" Gosser's objections to the questions were overruled. His following motion for a mistrial was also overruled. The same question was presented by the cross-examination of another character witness for the defendant Gosser.

In considering the propriety of these questions we must keep in mind that they were asked in the cross-axamination of a character witness for the defendant, not of the defendant himself. With respect to such witnesses, the rule is much broader than is the case in the cross-examination of a defendant. Proceeding on the assumption that the questions would have been improper if asked of the defendant, whose credibility as a witness can not be attacked by evidence of prior arrests without convictions or association with convicted felons or gamblers, Henderson v. United States, 202 F.2d 400, 405–406, C.A.6th, cert. denied, 349 U.S. 920, 75 S.Ct. 660, 99 L.Ed. 1253, rehearing denied, 349 U.S. 969, 75 S.Ct. 879, 99 L.Ed. 1290; United States v. Pennix, 313 F.2d 524, C.A.4th; the rule is not so limited in the cross-examination of a character witness. Questions of the kind here asked are relevant and material to test the opinion of the witness that the reputation of the defendant was good. In the present case the Government offered, out of the jury's presence, to prove all of the assumptions in its cross-examination. The District Judge also gave cautionary and limiting instructions to the jury several times with respect to the way this testimony could be considered. We find no prejudicial error in the rulings. Michelson v. United States, 335 U.S. 469, 479, 482, 69 S.Ct. 213, 93 L.Ed.

168; United States v. Giddins, 273 F.2d 843, 845, C.A.2nd, cert. denied, 362 U.S. 971, 80 S.Ct..955, 4 L.Ed.2d 900; Horton v. United States, 256 F.2d 138, 141 C.A. 6th; Krogmann v. United States, 225 F.2d 220, 226, C.A.6th.

Agent Kreitner testified for the Government about what happened at the time of the arrest of Pinciotti. He was asked, "Did you have any conversation with Mr. Gosser about—after you displayed the credentials?" Upon answering that he did, he was asked what the defendant said. He answered, "He said he objected to the police state type of the activities of our coming up to the union hall, and he said that he—he mentioned that he had been to the Reform School during the conversation with him he said he had spent some time—." At that point he was interrupted by government counsel, asking, "Well, just tell us what he said in regard to the—if anything, in regard to a search." Gosser's motion for a mistrial on the ground that the testimony about Gosser having been in the Reform School was improper and prejudicial was overruled. Appellant contends that the ruling was prejudicial error, in that Gosser, at that time, had not testified in his own behalf, and, in any event, evidence attacking his credibility as a witness was restricted to proof of prior conviction of a felony or of an offense involving moral turpitude. Henderson v. United States, supra, 202 F.2d 400, 405–406, C.A.6th, cert. denied, 349 U.S. 920, 75 S.Ct. 660, 99 L.Ed. 1253, rehearing denied, 349 U.S. 969, 75 S.Ct. 879, 99 L.Ed. 1290.

The District Judge conferred with counsel for the parties, out of the presence of the jury. He expressed the opinion that the statement of the witness was not a planned affair, but came as a surprise to government counsel, who immediately attempted to divert the mind of the witness to something different. He was, however, of the opinion that the statement of the witness was improper. He instructed the jury that whether Gosser made the remark or whether he had been in a Reform School was of absolute-

ly no concern to the jury in the hearing and determination of the case, and that the jurors should place no value upon the statement, but should forget it and eradicate it from their minds.

Gosser later testified in his own behalf and stated on cross-examination that he had known Tony Scott since he was about fifteen years old, when he was in Reform School with him, and that he had pleaded guilty to highway robbery and had received a sentence of thirty months. The jury at that time was instructed that the evidence given concerning a prior incarceration was to be considered as going only to the question of the credibility of the witness.

We are of the opinion that under the circumstances hereinabove set out, there was no prejudicial error in refusing to grant appellant's motion for a mistrial. Rule 52(a), Rules of Criminal Procedure; White v. United States, 279 F.2d 740, 749, C.A.4th, cert. denied, 364 U.S. 850, 81 S.Ct. 96, 5 L.Ed.2d 74; Kreinbring v. United States, 216 F.2d 671, 673, C.A. 8th; Weeks v. United States, 313 F.2d 688, 694, C.A.10th, cert. denied, 373 U.S. 922, 83 S.Ct. 1523, 10 L.Ed.2d 421; Jones v. United States, 282 F.2d 745, 747, C.A.4th, cert. denied, 365 U.S. 842, 81 S.Ct. 799, 5 L.Ed.2d 808.

At the conclusion of the cross-examination of Mrs. Niedomski, counsel for Gosser asked that the Government furnish him "copies of all statements that she has testified about." The Government gave to him two affidavits of the witness and transcriptions of seven interviews with her, but declined to turn over to him so-called "witness sheets," which had been prepared by Government counsel for use in the trial. The District Judge held a hearing out of the jury's presence to ascertain what the "witness sheets" contained and to determine whether they constituted a "statement"

of the witness which related to the subject matter as to which the witness had testified, and which under the Jencks Act would have to be produced for the use of the defendant. Section 3500, Title 18 United States Code. The Government attorney stated that they were his notes of what he expected the witness to testify to, prepared and dictated by him, that they did not contain a substantially verbatim recital of what the witness said, and was his work sheet in preparation for trial. He offered to take the stand if necessary. The District Judge held that the "witness sheets" were the attorney's work sheets in preparation for trial, that they did not constitute a "statement" of the witness within the meaning of the Jencks Act, and did not have to be produced for the use of the defendant. The ruling is challenged on this appeal.

The procedure used by the District Judge was in accordance with the ruling in Campbell v. United States, 365 U.S. 85, 81 S.Ct. 421, 5 L.Ed.2d 428, and Campbell v. United States, 373 U.S. 487, 83 S.Ct. 1356, 10 L.Ed.2d 501, wherein the Court held that the question was one of fact the determination of which by the District Judge would not be disturbed unless clearly erroneous. The "witness sheets" were not prepared or signed by the witness. Nor were they at any time approved by the witness, which is the distinguishing fact between this case and the Campbell case. In our opinion, the finding of the District Judge is not clearly erroneous and must be accepted on this review. Compare: Hickman v. Taylor, 329 U.S. 495, 511, 67 S.Ct. 385, 91 L.Ed. 451.

Other issues have been raised by the appellants, which have also had our consideration. We believe it is sufficient to say that we find them to be without merit without unduly lengthening this opinion by a detailed discussion of them.

The judgments are affirmed.