**UNITED STATES of America,**
**Appellee,**

v.

**John D. GRECO, Defendant-Appellant.**

**No. 162, Docket 27166.**

United States Court of Appeals
Second Circuit.

Argued Nov. 16, 1961.

Decided Jan. 12, 1962.

Certiorari Denied March 19, 1962.
See 82 S.Ct. 831.

John D. Roeder, New York City (Garey & Garey, New York City, on the brief; Jacob J. Rosenblum and Anthony J. Obadal, New York City, of counsel), for defendant-appellant.

Gerald E. Paley, Asst. U. S. Atty., S. D. of N. Y., Brooklyn, N. Y. (Robert M. Morgenthau, U. S. Atty., for the S. D. of N. Y., on the brief; Arthur I. Rosett, Asst. U. S. Atty., New York City, of counsel), for appellee.

Before MOORE, SMITH and HAYS, Circuit Judges.

MOORE, Circuit Judge.

Defendant, John D. Greco, appeals from a judgment of conviction entered by the district court after a trial without a jury under an indictment charging defendant with transporting and receiving stolen Canadian securities in violation of 18 U.S.C. §§ 2314 and 2315, and with conspiring with his codefendant, Edward B. Loree, to commit these offenses in violation of 18 U.S.C. § 371. Loree pleaded guilty prior to trial and was the government's principal witness.

Loree testified that early in April, 1958, Greco, whom he had met previously, proposed that Loree sell some Canadian bonds for him; that at a second meeting Greco told him that the bonds were stolen; that Greco in New York delivered to him Canadian bonds in the face amount of $36,500, which Loree subsequently took to Miami, Florida; and that he (Loree) was arrested by the FBI in Florida with the bonds in his possession.

Greco did not take the stand. The only witness called by the defense was

a disbarred attorney who was serving a prison term for larceny. He testified that he talked to Loree a few days after Loree was arrested; that Loree told him that he knew Greco and that Greco had been arrested also; that Greco had nothing to do with the "hot" bonds; but that he (Loree) intended to take full advantage of Greco's arrest in an attempt to get himself out of the mess.

■ Although other grounds for reversal are argued, appellant's principal ground is the alleged failure of the Government to produce certain handwritten notes made by FBI agents during interviews with Government witnesses Loree and DeKoninck. So many factual situations, each slightly different from the others, have been (and are being) presented to the courts since the enactment of the so-called Jencks Act (18 U.S.C. § 3500) that it would be expected that every fact possibility would have been adjudicated by now. Any such hope is obviously unrealistic and would show a failure to appreciate the resourcefulness and imagination of the legal mind and able defense counsel. Because these factual variations have formed the basis for the various decisions in this field, a rather detailed review of the facts must be made. Any attempt in this case to review all the decisions on the subject and to give to the trial judges, present and future, an infallible guide to all rulings on Jencks Act questions is quickly abandoned as highly presumptuous and impossible, tempting though it be.

Loree was apprehended in Miami by Agents of the FBI on April 22, 1958, and was immediately interviewed. Handwritten notes (not verbatim statements) were taken by the Agents. From these notes more complete reports of the interview were subsequently prepared. Two documents relating to this interview were produced and given to appellant, one (Exh. 2 id.) an unsigned statement of Loree, dated April 22, 1958, and the other (Exh. 6 id.) consisting of two FBI office memoranda (one of nine pages), dictated May 9, 1958, and dated May 14, 1958. The key fact is found in the stipulation of defense counsel that the FBI Agents would have testified that these two exhibits reflected the contents of the notes and that the notes were destroyed after the reports were completed. There was no testimony contradictory of this fact.

In addition, the government delivered to defense counsel during Loree's cross-examination other statements relating to Loree's interview and a twenty-page transcription of his grand jury testimony. As to the witness DeKoninck, the Agent's testimony was similar. He made notes, dictated statements, compared the reports with his notes and after he saw that the reports (Exhs. 4 and 8) fully reflected the material in the notes, he destroyed the notes. There was no proof that the handwritten notes came within the purview of paragraph (e) (1) or (2) of Section 3500—in fact, the Agent testified that he did not take a verbatim statement. Another Agent gave similar testimony as to another report (Exh. 3 id.) dealing with Loree.

Apparently having found nothing in the mass of material turned over by the government to weaken the witnesses' testimony and choosing to give no weight to the Agents' testimony of accuracy in transcription, appellant seeks to have the court assume that in the destroyed handwritten notes, there must have been a veritable gold mine of cross-examination material. In so arguing, appellant raises the same question urged upon the Supreme Court in Campbell v. United States, 365 U.S. 85, 81 S.Ct. 421, 5 L.Ed. 2d 428 (1961), namely, "that destruction [of notes] without regard to the circumstances should be so regarded [i e., as non-compliance under § 3500]" (p. 98) [81 S.Ct. p. 428]. But just as the Supreme Court concluded that "this [Campbell] record affords us no opportunity to decide this important question of the construction of subsection (d)," so is it to be doubted that Greco provides a proper vehicle.

In Campbell, the Supreme Court was concerned over the absence of facts concerning the "Interview Report" which the

trial judge did not deliver to defense counsel. The Court, therefore, remanded for further inquiry limited to the circumstances surrounding the preparation of the "Interview Report," stressing the availability of the Agent who was not called. Here all material elements found lacking in Campbell are present. The Agents principally involved presented themselves for cross-examination; as to others, defense counsel stipulated to the facts they would recite. Reports or statements were not withheld by the trial judge or the government. All material in existence covered by Section 3500 and much not included therein was made available to the defense.

There is no need to review *in extenso* the history of Section 3500 or the cases thereunder. The two opinions by Justices Brennan and Frankfurter in Campbell fully discuss the procedures to be followed in preliminary investigations by the trial court as to whether there has been proper compliance with the statute. See, also, United States v. Crosby, 2 Cir., 1961, 294 F.2d 928. Congress, in using the words "possession" and "elects not to comply," clearly was not addressing itself to non-existent notes. Nor is there any legislative requirement that all notes be preserved after transcriptions have been made and checked for accuracy. To date there has been no convincing proof that truth is to be found only in handwritten notes and that, therefore, special sanctity should be attached thereto. Section 3500 "designed to further the fair and just administration of criminal justice" (Campbell, p. 92) [81 S.Ct. p. 425] should not be dependent for its efficacy to accomplish its purpose upon mechanical means. If accuracy is to be found only in pencil and pen, then typewriters, tape recorders, dictaphones and all the paraphernalia of the business machine industry should be excluded from the courtroom. Actually, if there be any basis for any such assumption, the thought and deliberation which went into statements slowly written with a quill pen must have suffered in quality upon the invention of the rapid and less deliberate fountain pen.

There is no evidence that the notes were destroyed with intent to suppress evidence. Nor is any such claim made on appeal. Appellant argues that whether or not there was intent to suppress evidence, the destruction of the notes was tantamount to a refusal to produce the statements, thus requiring the imposition of Section 3500 sanctions. However, we have already held that such a situation does not amount to a refusal by the government to produce a statement "in the possession of the United States." United States v. Thomas, 2 Cir., 1960, 282 F.2d 191, 194. We still are not convinced that in words or in spirit the Jencks Act imposes a duty on FBI agents to preserve notes which are taken and used only as a guide in preparing a formal statement for the witness to sign. While the majority opinion in Campbell observed that they had no opportunity to decide this question, Mr. Justice Frankfurter in a separate opinion pointed out that "nothing in the legislative history of the Act remotely suggests that Congress' intent was to require the Government, with penalizing consequences, to preserve all records and notes taken during the countless interviews that are connected with criminal investigation by the various branches of the Government" (p. 102) [81 S.Ct. 430].

Appellant also argues that there was insufficient evidence for the trial court to infer that the bonds involved were stolen. However, a hole cut in a bank vault wall, an acetylene torch lying nearby and testimony (by stipulation) that the bonds involved in this case were among those missing are facts sufficient to support an inference of theft.

Another alleged error was the failure to grant a motion to strike certain testimony relating to prior similar transactions by the appellant. This testimony was admitted as evidence that appellant knew the Canadian bonds were stolen. Appellant does not claim that such evidence was inadmissible, but only that the

prior transactions were not sufficiently established. However, testimony that appellant had attempted to dispose of Series E bonds not in his name through a private individual for less than one-half of their face value certainly could support an inference that appellant was attempting to dispose of bonds he knew to be stolen. Moreover, this case was tried before a judge (sitting without a jury) who could properly evaluate this testimony without prejudice to appellant.

Appellant contends that the federal statutes involved are not applicable when the securities were not stolen in this country. However, the language of the present statute is broad enough to justify the federal courts in applying the statute whenever they determine that the securities were stolen in another country. We are not here concerned with the unlikely case where the goods or securities might be "stolen" according to the laws of one of the two countries and yet not be "stolen" according to the laws of the other country. In the absence of citation of statutes or decisional authority to the contrary, we may presume that these securities would be considered stolen under Canadian law.

Finally, appellant would have us reverse on the ground that he was denied his constitutional right to compulsory process. No application was made to bring witnesses from Canada and no motion was made to take testimony abroad. At no time did appellant state what witnesses, if any, he would have liked to bring to this country. Rather, he argues that he was convicted in violation of the Sixth Amendment since an essential element of the crimes charged was the theft which occurred in Canada and he did not have an *absolute* right to compel the attendance of Canadian witnesses on this issue. However, the Sixth Amendment can give the right to compulsory process only where it is within the power of the federal government to provide it. Otherwise any defendant could forestall trial simply by specifying that a certain person living where he could not be forced to come to this country was required as a witness in his favor. The fact that appellant could not compel the attendance of an unnamed witness for whom he never asked did not deprive him of any constitutional right.

The judgment of conviction is affirmed.