350 F.2d 523
 UNITED STATES of America, Plaintiff-Appellee,
v.
Dominic C. LONARDO, Defendant-Appellant.
UNITED STATES of America, Plaintiff-Appellee,
v.
Mario John GUERRIERI, Defendant-Appellant.
UNITED STATES of America, Plaintiff-Appellee,
v.
Peter MANOS, Defendant-Appellant.
UNITED STATES of America, Plaintiff-Appellee,
v.
Richard A. STEWART, Defendant-Appellant.
 Nos. 15681-15684.
 United States Court of Appeals Sixth Circuit.
 September 9, 1965.
 
 James J. Carroll, and Gerald S. Gold, Cleveland, Ohio, for Dominic C. Lonardo.
 Gerald S. Gold, Cleveland, Ohio, for Richard A. Stewart.
 Nathaniel R. Jones, Asst. U. S. Atty., Cleveland, Ohio, Merle M. McCurdy, U. S. Atty., Cleveland, Ohio, on brief, for appellee.
 Before O'SULLIVAN, PHILLIPS and EDWARDS, Circuit Judges.
 EDWARDS, Circuit Judge.
 The United States is
 "* * * a sovereignty whose obligation to govern impartially is as compelling as its obligation to govern at all; and whose interest, therefore, in a criminal prosecution is not that it shall win a case, but that justice shall be done." Berger v. United States, 295 U.S. 78, 88, 55 S.Ct. 629, 633, 79 L.Ed. 1314 (1935).
 
 
 1
 Defendants-appellants were found guilty by a jury on one of two counts of a federal indictment charging them with falsely representing themselves to be FBI agents in violation of Title 18 U.S.C. § 912. A federal judge in the Northern District of Ohio sentenced them to the custody of the Attorney General for three years, with three months of such custody to be served in jail, and sentences to be suspended thereafter with defendants placed on five years probation.
 
 
 2
 Defendants appeal. Having been convicted for employing illegal means to achieve a lawful purpose, they now assert that their convictions were secured by the government by illegal means.
 
 
 3
 Defendants Lonardo and Guerrieri were agents of a bonding company which had written a $50,000 bond for one Joseph Arrington and a $25,000 bond for one Alfred Oponowicz. Both of these latter had previously been charged with armed robbery of a bank. When neither of them appeared for trial, defendants undertook to locate them in order to avoid the penalty of forfeiture of the total of $75,000 in bonds.
 
 
 4
 It appears that defendant Lonardo learned that a man named Louis Gaye was a close associate of Arrington's and was assisting in purchasing a car for Arrington. On the evening of February 8, 1963, assisted by defendant Stewart, Lonardo waited near the car lot until Gaye picked up the certificate of title and drove away. Lonardo and Stewart followed, forced Gaye to stop his car, and at pistol point, forced Gaye and his passenger, Betty Flonnoy, to get into the Lonardo car. Subsequently, these two defendants were joined by defendant Guerrieri and defendant Manos.
 
 
 5
 For several hours thereafter Gaye and Flonnoy were questioned by defendants in automobiles and at Gaye's apartment. Ultimately Gaye made a phone call in defendants' presence to Arrington which led to his capture, trial and conviction. The testimony indicated that when Gaye's car was stopped, and at various other times, defendants displayed pistols. Gaye and Flonnoy at trial testified that defendants repeatedly identified themselves as FBI agents. This defendants denied — but the jury quite apparently believed Gaye and Flonnoy on this point. Defendants also testified to contacts with various members of the Cleveland Police Department before and during the events of February 8, which they apparently regard as sanction of their extraordinary[1] conduct.
 
 
 6
 After Arrington's arrest and return to Cleveland on March 15, 1963, Gaye and Miss Flonnoy were interviewed by Agent O'Hara of the FBI. An FBI stenographer took notes of the interview and transcribed them.
 
 
 7
 Subsequently, Agent O'Hara employed the transcripts in making out formal FBI interview reports — called 302 Reports — of these witnesses' testimony. Thereafter defendants were indicted for falsely posing as FBI agents.
 
 
 8
 A week and a half before trial of the defendants Agent O'Hara removed the copies of the stenographic transcripts from the file of the United States Attorney and destroyed them. The agent testified that destruction of "interview notes" was in accordance with FBI procedures once the formal interview reports had been made out.
 
 
 9
 At trial defendants' counsel sought and received permission under the Jencks Act, Title 18 U.S.C. § 3500, to inspect the 302 Reports and to use them for purposes of cross-examination. He also sought the original stenographic transcripts for the same purpose. These, of course, were not available to be produced, since they had been destroyed.
 
 
 10
 At trial the United States contended that all that was destroyed were the notes of the agent after the notes had been transcribed and that the ultimate reports were produced. The government claimed that these "interview notes" of the agent were not the statements of the witnesses as contemplated by the Act.
 
 
 11
 Defendants, on the other hand, contended that what had been destroyed were the actual verbatim statements of the witnesses as given to a shorthand reporter and transcribed by her. They also contended that at least the Flonnoy statement was adopted and approved by the witness.
 
 
 12
 In this regard defendants rely upon the testimony of the FBI stenographer. This same witness also gave support to Miss Flonnoy's testimony that in her statement to the FBI she had referred to the Cleveland police contacts during the events of February 8, but that such references were eliminated in the final "302 Reports." Defendants contended that the original transcripts would have been valuable to them for purposes of cross-examination of Gaye and Flonnoy.
 
 
 13
 At the trial the District Judge took testimony dealing with the nature of the destroyed documents and apparently concluded that they were "statements" within the meaning of the Jencks Act. He did not, however, grant defendants' motions for striking the Gaye and Flonnoy testimony or for a mistrial, but devised an alternative sanction. He allowed cross-examination as to the nature of the documents and the method of their destruction before the jury and charged the jury that it could infer from the fact of destruction that the destroyed documents contained material unfavorable to the government's case.
 
 
 14
 In this appeal we are required first to determine whether or not the documents which were destroyed were "statements" within the meaning of the Jencks Act. If so, we must then determine whether or not the "sanction" employed by the District Judge meets the requirements of the Jencks Act.
 
 
 15
 As to the "statement" question, the Jencks Act, 18 U.S.C. § 3500,[2] provides in part:
 
 
 16
 "The term `statement' * * * means * * * (2) a stenographic * * * recording, or a transcription thereof, which is a substantially verbatim recital of an oral statement made by said witness to an agent of the Government and recorded contemporaneously with the making of such oral statement." 18 U.S.C. § 3500.
 
 
 17
 The two government witnesses, Gaye and Flonnoy, testified that at the first FBI interview a stenographer was present who took down what they said word for word. Each also testified that they later saw and read a transcript of the interview.
 
 
 18
 The government stenographer who took the statements which are in controversy testified as follows:
 
 
 19
 "Q Now, going to the time of March the 15th, when you were called in and Mrs. Flonnoy was making her statement, can you tell us — I am not asking you to recall what she said, but the manner in which this statement was taken; for instance, was it question and answer? Did the officers ask her a question and she give an answer, or was it just a rhetorical statement by her?
 
 
 20
 "A She was advised to tell it in her own words, so she would say — she would go on — maybe they would stop, and they would say, `Did you say this?' and she would say, `No. I said this.' That would clarify anything they didn't understand, but she did give it herself.
 
 
 21
 "Q You were taking it down, your notes, exactly from her voice, her statement?
 
 
 22
 "A Yes.
 
 
 23
 "Q At any time was the statement that Mrs. Flonnoy made paraphrased by one of the officers, for instance, did she go on and make a certain statement, and then the officer put it in his words so that you would put his words in your notes rather than what the witness, rather than what the witness, Flonnoy, said?
 
 
 24
 "A The only thing I can remember is grammar, you know, correcting grammar.
 
 
 25
 "Q You mean the officer would interpose and interfere and correct her grammar in the way she was telling it?
 
 
 26
 "A Yes, sir.
 
 
 27
 "Q Would he in any sense formulate any statement in his own words from what she said, and then dictate it to you, what he, in his words, interpreted her to say? I hope that is clear to you. In other words, did she make a statement and then the officer would, or dictate it to you, what you should put down in your notes as her statement?
 
 
 28
 "A As I stated before, the only thing I really remember is grammar, not really changing it.
 
 
 29
 "Q Your recollection is distinct. You took down word for word what the witness said?
 
 
 30
 "A Yes."
 
 
 31
 This witness also testified that the two statements covered thirty pages — about twelve pages to the Flonnoy statement and the balance in the Gaye statement.
 
 
 32
 This record convinced the trial judge that the destroyed transcripts were Jencks Act statements. He said:
 
 
 33
 "No Court is going to sit by and observe the destruction of a statement which comes within the Jencks Act the matter of a few days before trial, and simply accept it as a statement of fact, and accept it in the sense that the Jencks Act requires no further sanctions or compliance."
 
 
 34
 We believe he was correct in this conclusion. The testimony pertaining to the taking of the statements is sufficient for us to hold that these were "stenographic" transcripts which were "substantially verbatim" and "contemporaneously recorded" within the meaning of the Jencks Act, 18 U.S.C. § 3500(e) (2). From the testimony referred to we hold that the statements "can fairly be said to be the witness' own." Palermo v. United States, 360 U.S. 343, 350, 79 S. Ct. 1217, 3 L.Ed.2d 1287 (1959).
 
 
 35
 The United States Supreme Court has considered the application of the Jencks Act to one form of statement. Where an FBI agent took longhand notes in the course of an interview, reviewed them with the witness, subsequently incorporated the substance of these notes in an Interview (or 302) Report, and then destroyed the notes, and the District Court held that the evidence showed that the report was "almost in ipsissima verba" the witness' narrative, the Supreme Court held the Interview Report producible. Campbell [II] v. United States, 373 U.S. 487, 491, 83 S.Ct. 1356, 10 L.Ed. 2d 501 (1962).
 
 
 36
 In this case, of course, we deal with somewhat different facts. As we have noted, the 302, or Interview Reports, were produced. This appeal concerns the transcripts taken in shorthand and then typed by the stenographer for the FBI. Prior to their destruction these transcripts had been reworked into Interview Reports — but at least as to the Flonnoy statement, with substantial variances. Thus far there does not appear to be any precedent directly in point in relation to this type of statement. But the grounds which we have recited for the inclusion of such a statement under the Jencks Act appear, if anything, to be stronger than those supporting the holdings above.
 
 
 37
 On this record we find no need to pass on defendants' claim that the statements were also producible under Title 18 U.S.C. § 3500(e) (1) because they subsequently were read and adopted by Gaye and Flonnoy. See Williams v. United States, 338 F.2d 286 (C.A.D.C.1964).
 
 
 38
 Perhaps we should also seek to define the limits of our holding in this regard.
 
 
 39
 This is not a situation wherein the identical information was otherwise available to defendants. See Rosenberg v. United States, 360 U.S. 367, 370-371, 79 S.Ct. 1231, 3 L.Ed.2d 1304 (1959); Killian v. United States, 368 U.S. 231, 244, 82 S.Ct. 302, 7 L.Ed.2d 256 (1961).
 
 
 40
 It is also clear that no satisfactory "secondary evidence" was made available to counsel for defendants. The fact that reference to Cleveland police officers' participation in the events of February 8 was deleted from the Flonnoy 302 Report is sufficient evidence that it was not a substitute for the "statement" which was destroyed. Cf. United States v. Thomas, 282 F.2d 191, 194-195 (C.A.2, 1960).
 
 
 41
 In the words of Mr. Justice Brennan dissenting in Rosenberg v. United States, supra:
 
 
 42
 "This is not a case in which the statement erroneously withheld from the defense merely duplicated information already in the defense's possession; it is not a case in which the witness' testimony was unimportant to the proofs necessary for conviction; and it is not a case in which the witness' statement was wholly void of possible use for impeachment." Rosenberg v. United States, supra, 360 U.S. at 376, 79 S.Ct. at 1237 (Footnote omitted.)
 
 
 43
 Having thus held that the statements demanded by the defendants (and not produced because previously destroyed) were Jencks Act statements, we turn to the question of appropriate sanctions. The only sanctions mentioned squarely in the Jencks Act are: "[T]he court shall strike from the record the testimony of the witness, and the trial shall proceed unless the court in its discretion shall determine that the interests of justice require that a mistrial be declared."
 
 
 44
 In this case, however, the District Judge, after concluding that the statements were governed by the Jencks Act, allowed the jury to hear testimony about them and their destruction and charged the jury thus:
 
 
 45
 "* * * I now instruct you that the destruction by the special agent of the Federal Bureau of Investigation of the typewritten transcript of the statements made by the witnesses Gaye and Flonnoy permits you to draw the inference that the documents destroyed contained matters which were unfavorable to the Government in the prosecution of this case. I say to you that it permits you to draw this inference. It does not compel you to draw this inference. That is the reason I permitted you to hear the officer testify on this subject, and it is for you to determine whether or not you will draw such an inference or not."
 
 
 46
 It seems to us that the District Judge was in doubt as to whether the destruction of the statements was in good or bad faith and that he felt under all of the circumstances a lesser penalty was sufficient.
 
 
 47
 Obviously, this issue has aroused the attention of the United States Supreme Court. In Campbell [I] v. United States, 365 U.S. 85, 81 S.Ct. 421, 5 L.Ed.2d 428 (1961), we find the question squarely posed — but not answered:
 
 
 48
 "The parties argue whether destruction may be regarded as the equivalent of noncompliance with an order to produce under that subsection. The Government contends that only destruction for improper motives or in bad faith should be so regarded. The petitioners contend that destruction without regard to the circumstances should be so regarded. However, this record affords us no opportunity to decide this important question of the construction of subsection (d)." Campbell v. United States, supra at 98, 81 S.Ct. at 428.
 
 
 49
 Also in Campbell [II] v. United States, 373 U.S. 487, 83 S.Ct. 1356, 10 L.Ed.2d 501 (1963), we find further reference in this footnote:
 
 
 50
 "These issues, basically, are whether the Interview Report is producible under § 3500(e) (2) of the Jencks Act and whether, if the notes are producible under the Act, their destruction gives rise to sanctions under subsection (d), or permits secondary evidence of their contents to be produced. The second district judge found that the Interview Report was a substantially verbatim recording of Staula's oral statement to Toomey and hence producible under § 3500(e) (2). The Court of Appeals disagreed. Moreover, in denying rehearing, the Court of Appeals rendered an opinion holding that no sanctions could attach to Toomey's destruction of his notes because such destruction had not been in bad faith. 303 F.2d at 751. Our holding that the Interview Report is producible under § 3500(e) (1) makes it unnecessary for us to consider any of the other issues, and we intimate no view on the correctness of the Court of Appeals' rulings on them." Campbell v. United States, supra at 491, n. 5, 83 S.Ct. at 1359.
 
 
 51
 In the case before us we see no need to characterize the destruction of these statements as in good faith or bad — as honest or corrupt. These were no long lost documents or clerical filing errors. The destruction was deliberate; it was on the eve of trial; it was accomplished by the government agent in charge of preparing evidence for the prosecution of the case. The fact that the agent who destroyed them may have done so in reliance upon FBI regulations (or in good faith belief that such existed) does not alter the nature of the sanctions imposed by the statute.
 
 
 52
 All this case requires us to hold, and all we do hold, is that where a stenographic transcript of a witness' statement has been made which constitutes a "statement" within the meaning of the Jencks Act, the government cannot avoid the responsibility for producing it or losing the benefit of that witness' testimony by deliberately destroying that transcript on the eve of the trial. This holding is further restricted, as hereinafter set forth more particularly, to a situation where the defendant has not been furnished, in the form of a 302 Report or otherwise, the very same information contained in the statement which has been destroyed.
 
 
 53
 Striking of the witnesses' testimony might well have been an inadequate remedy. In "the interests of justice"[3] we believe that the District Judge should have entered an order for mistrial when it became obvious that the statements could not be produced, and that we must do so now.
 
 
 54
 We recognize, of course, that this may mean that the government is deprived of important evidence at the new trial and that this deprivation might frustrate this prosecution. But our system of justice requires that the government should set an example of living by its own law.
 
 
 55
 As we have noted, the District Judge found, and our review of the record convinces us that he did so correctly, that there were substantial differences between the stenographic transcript taken from witness Flonnoy and the 302 Report which the court ordered produced and which was produced.
 
 
 56
 There was no such finding as to substantial differences between the stenographic transcript of witness Gaye's testimony and the 302 Report similarly produced in relation to him. On remand for new trial, if the District Judge finds that the defendant has been furnished, by dint of the 302 Report, with "the very same information" to which they were entitled, there would then be no requirement of Jencks Act sanctions to forbid the testimony of witness Gaye. See Rosenberg v. United States, supra, 360 U.S. at 371, 79 S.Ct. 1231.
 
 
 57
 One other matter needs to be dealt with briefly. On appeal the government took the position that no sanctions were required under 18 U.S.C. § 3500(d) because it had not elected not to comply with a court order for production of the statements. The appellee's brief says:
 
 
 58
 "The Act clearly relates to statements `in the possession of the United States.' This paragraph of the Act does not say statement or documents `once' in their possession."
 
 
 59
 This record is clear on the point that these statements were "in the possession of the United States." We are asked to hold that they were not "in the possession of the United States" for Jencks Act purposes because of their deliberate destruction by an agent of the United States a week and a half before trial.
 
 
 60
 Legislation should be interpreted in accordance with its stated and its obvious intent. United States v. Braverman, 373 U.S. 405, 408, 83 S.Ct. 1370, 10 L.Ed.2d 444 (1963); Owensboro Wagon Company v. Commissioner of Internal Revenue, 209 F.2d 617, 619 (C.A.6, 1954). To hold with the interpretation argued for above would be to permit evasion and emasculation of the Jencks Act to the point of total ineffectiveness.
 
 
 61
 It should be added that we believe our holding in this case is considerably less far-reaching than our colleague, Judge O'Sullivan, deems it. Specifically, we deem it entirely consistent with the recent holdings of this court affirming District Judges' rulings that FBI Agents' notes and government attorneys' witness sheets were not in the circumstances there involved Jencks Act statements. United States of America v. Hoffa et al., 349 F.2d 20 (C.A.6, 1965). United States v. Gosser, 339 F.2d 102, 113 (C. A.6, 1964).
 
 
 62
 Reversed, sentences vacated, and remanded for new trial in accordance with this opinion.
 
 
 
 Notes:
 
 
 [1]
 This claim is not an issue in this appeal, and the court reserves comment thereon for an appropriate case
 
 
 [2]
 "§ 3500Demands for production of statements and reports of witnesses.
 "(a) In any criminal prosecution brought by the United States, no statement or report in the possession of the United States which was made by a Government witness or prospective Government witness (other than the defendant) to an agent of the Government shall be the subject of subpena, discovery, or inspection until said witness has testified on direct examination in the trial of the case.
 "(b) After a witness called by the United States has testified on direct examination, the court shall, on motion of the defendant, order the United States to produce any statement (as hereinafter defined) of the witness in the possession of the United States which relates to the subject matter as to which the witness has testified. If the entire contents of any such statement relate to the subject matter of the testimony of the witness, the court shall order it to be delivered directly to the defendant for his examination and use.
 "(c) If the United States claims that any statement ordered to be produced under this section contains matter which does not relate to the subject matter of the testimony of the witness, the court shall order the United States to deliver such statement for the inspection of the court in camera. Upon such delivery the court shall excise the portions of such statement which do not relate to the subject matter of the testimony of the witness. With such material excised, the court shall then direct delivery of such statement to the defendant for his use. If, pursuant to such procedure, any portion of such statement is withheld from the defendant and the defendant objects to such withholding, and the trial is continued to an adjudication of the guilt of the defendant, the entire text of such statement shall be preserved by the United States and, in the event the defendant appeals, shall be made available to the appellate court for the purpose of determining the correctness of the ruling of the trial judge. Whenever any statement is delivered to a defendant pursuant to this section, the court in its discretion, upon application of said defendant, may recess proceedings in the trial for such time as it may determine to be reasonably required for the examination of such statement by said defendant and his preparation for its use in the trial.
 "(d) If the United States elects not to comply with an order of the court under paragraph (b) or (c) hereof to deliver to the defendant any such statement, or such portion thereof as the court may direct, the court shall strike from the record the testimony of the witness, and the trial shall proceed unless the court in its discretion shall determine that the interests of justice require that a mistrial be declared.
 "(e) The term `statement,' as used in subsections (b), (c), and (d) of this section in relation to any witness called by the United States, means —
 "(1) a written statement made by said witness and signed or otherwise adopted or approved by him; or
 "(2) a stenographic, mechanical, electrical, or other recording, or a transcription thereof, which is a substantially verbatim recital of an oral statement made by said witness to an agent of the Government and recorded contemporaneously with the making of such oral statement." 18 U.S.C. § 3500.
 
 
 [3]
 "If the United States elects not to comply with an order of the court under paragraph (b) or (c) hereof to deliver to the defendant any such statement, or such portion thereof as the court may direct, the court shall strike from the record the testimony of the witness, and the trial shall proceed unless the court in its discretion shall determine thatthe interests of justice require that a mistrial be declared." 18 U.S.C. § 3500(d) (Emphasis added.)
 
 
 
 63
 O'SULLIVAN, Circuit Judge (dissenting).
 
 
 64
 Because I do not believe that the involved circumstances required the District Judge to impose the sanctions of the Jencks Act, 18 U.S.C.A. § 3500, I am unable to agree with the majority opinion. I share my brothers' concern for maintaining the integrity of procedures employed in criminal trials and recognize the power of federal courts to exercise surveillance over the conduct of federal officers. Yet I cannot avoid the conclusion that this is but a case where persons convicted of crime seek judicial absolution by wearisome repetition of inapplicable passages from the immortal literature of the law, and by characterizing as "deliberate, malicious and corrupt," conduct of an FBI agent which, at worst, I would characterize as unthinking or which the meanly uncharitable might call stupid. While in this field we do not test the propriety of the challenged conduct by our view of whether prejudice to an accused resulted, I feel it not inappropriate to say that my own study of the record persuades me that no impairment of appellants' defense resulted from what happened. As support for my view that the District Judge exercised sound discretion in handling the situation may I also, at the cost of some repetition, recite the interesting events which provided the setting for this action.
 
 
 65
 Defendant Dominic C. Lonardo of Cleveland, Ohio, and defendant Mario John Guerrieri of Youngstown, Ohio, were both in the bail bond business. They were agents of a concern identified as The Maryland National Insurance Company, but Ohio law and their arrangement with their company required that Lonardo and Guerrieri personally pay the bill when bonds were forfeited for failure of a client to appear for trial. Londardo had written a $50,000 bail bond for one Joseph Arrington and Guerrieri provided $25,000 bail for one Oponowicz who, with Arrington, a Charles Pollizi and another, were to appear for trial on burglary charges in the Criminal Division of the Common Pleas Court of Cuyahoga County, Ohio, on February 4, 1963. Although Lonardo had been in touch with Arrington on the evening before the trial, Arrington failed to appear for trial and Oponowicz disappeared shortly after appearing at the courthouse and has not been located since. The bail bonds of Arrington and Oponowicz were accordingly forfeited and if Lonardo and Guerrieri were unable to produce them within a prescribed time, they stood to personally pay $50,000 and $25,000, respectively. Lonardo and Guerrieri were, therefore, interested in finding their missing principals.
 
 
 66
 The government's evidence was such that the jury could, and evidently did, find the following facts which constituted the crime for which defendants were indicted and convicted. From some source, Lonardo learned that one Louis Gaye had information as to the whereabouts of the fugitive Arrington. On the day in question, Lonardo, defendant Stewart and a nondefendant, all armed, apprehended Gaye driving a car on a Cleveland street. With pointed guns and calling out that they were the FBI, they ordered Gaye to the curb and at gun point took Gaye and a lady companion, Betty Mae Flonnoy, prisoners. Lonardo and his companions then took their prisoners to the vicinity of a Cleveland police station where defendants Mario Guerrieri and Peter Manos joined the party. Mrs. Flonnoy was directed to get in a second car and after another stop both cars were driven to Gaye's home with the idea that from there Gaye would make contact with Arrington. Gaye and Mrs. Flonnoy were apprehended in the late afternoon. Gaye was kept in custody until about 4:00 A.M. the next morning and Mrs. Flonnoy was taken home by the Lonardo party sometime after midnight. The coup worked and through a call to Birmingham, Alabama, by Gaye the whereabouts of fugitive Arrington was discovered and he was captured and returned to Cleveland for trial. There was ample evidence that throughout the involved events Lonardo and party justified their conduct by representing that they were a party of FBI agents, and implemented this pretense by the display of their guns.
 
 
 67
 Defendants denied that they represented themselves to be FBI agents. Otherwise they offered little change in the above scenario. Lonardo, Guerrieri, Manos and Stewart were all carrying guns, but attributed the carrying and display of their armament to fear that the fugitive Arrington, described, and probably correctly, as a dangerous man, would appear or have equally dangerous associates. The Cleveland police were also interested in apprehending Arrington and knew something of and may have cooperated in what was going on. The appendices before us, however, provide no clear explanation as to why the capture and inquisition of Gaye were not turned over to the police authorities. Disclaiming that they held themselves out as FBI agents, the defendants, so far as the appendices disclose, provide no information as to what they did tell Gaye and Mrs. Flonnoy to justify their being taken and held captive.
 
 
 68
 The above events were the subject matter of the questioning of the witnesses Flonnoy and Gaye and of the stenographer's transcripts later destroyed by an FBI agent. Because the destroyed transcripts apparently contained some verbatim statements, I accept the District Judge's determination that they were "statements" within the meaning of the Jencks Act. The majority opinion discusses the background to their destruction before concluding that the resulting nonproduction calls for a new trial at which the testimony of the witness Flonnoy will not, and that of witness Gaye may not, be admitted. I construe the opinion, however, as announcing a rigid rule that regardless of the circumstances, intentional destruction by an agent of the government of any writing that can be found to be a "statement" within the meaning of § 3500(e), effectively forecloses the government from using the testimony of the witness unless "the very same information" is made available to the defense. This will be so without reference to the agent's good faith so long as the destruction was deliberate. My brothers say,
 
 
 69
 "In the case before us we see no need to characterize the destruction of these statements as in good faith or bad — as honest or corrupt. * * The fact that the agent who destroyed them may have done so in reliance upon FBI regulations (or in good faith belief that such existed) does not alter the nature of the sanctions imposed by the statute." (Emphasis supplied.)
 
 
 70
 In the case at bar, application of this rule may well be tantamount to dismissal because the government must rely upon the witnesses Gaye and Flonnoy to sustain its case. The rule will indeed be far reaching; henceforth every investigative branch of the government will be under the compulsion to refrain from destroying any piece of paper that can arguably be found to be a "statement" under the Jencks Act. No error of judgment or good faith belief in the propriety of destroying such a statement by any government employee will permit escape from the sanctions of the Jencks Act, unless "the very same information" has somehow been preserved in another form.
 
 
 71
 In my view, neither the language of the statute nor any decision of the United States Supreme Court or any other court construing the Act supports such results. Certainly the decision in Jencks v. United States, 353 U.S. 657, 77 S.Ct. 1007, 1 L.Ed.2d 1103 (1957), which precipitated Congress to pass the Jencks Act, did not so hold nor have we been cited any case which before Jencks announced such a rule. The sanctions of the statute are to be applied when the government fails to produce a statement "in the possession of the United States" 18 U.S.C. § 3500 (b), (Emphasis supplied) and do not purport to cover statements not in its possession.
 
 
 72
 Because my brothers appear to give some consideration to the circumstances involved, notwithstanding the rigid rule announced, I consider it important to review some of their observations before discussing my view of the law. I do this because I feel that, there being no compelling rule to follow, it was within the discretion of the District Judge to determine how best to accord defense counsel full use of the circumstances disclosed.
 
 
 73
 1) The majority opinion says, "It seems to us that the District Judge was in doubt as to whether the destruction of the statements was in good or bad faith * * *." (Emphasis supplied.) Notwithstanding his early irritation over the destruction of the statements, after full investigation of the circumstances he concluded, "I do not think that the court, under these circumstances, should find, per se, bad faith on the part of the Government or the Federal Bureau of Investigation, such per se bad faith as would authorize this Court to strike the testimony of these witnesses from this case." (Emphasis supplied.)
 
 
 74
 2) The majority state that the transcript made by the stenographer from her shorthand notes "had been reworked into Interview Reports — but at least as to the Flonnoy statement, with substantial variances." (Emphasis supplied.) I do not get such impression. The agent involved, one O'Hara, testified that at the beginning of his interview he had in mind taking a signed statement from the witness Flonnoy. To that end he had dictated an appropriate preamble reading, "I, Betty Flonnoy, voluntarily furnish the following information," etc. In the course of the interview, however, he decided that a signed statement would be impracticable. During the interview, sometimes the witness' remarks were taken down in the first person and sometimes the agent would correct her grammar and, according to the agent, he dictated part of the information, stating that the stenographer's notes were "a combination" of a verbatim account from the witness and the agent's own dictation. Regardless of how much of the transcript was in Flonnoy's own words, fair reading of the testimony leads me to conclude that the agent testified correctly when he said that the only changes made by him in putting the stenographer's transcript into the FBI's regular report Forms No. FD 302 were the deletion of the quoted preamble and putting all of the witness' statement into the third person.
 
 
 75
 3) The witnesses Flonnoy and Gaye both testified that Exhibits A and B, being respectively the Form 302 reports of their interview statements, correctly reflected what they had told the agent.[1] There is no suggestion that the Gaye Report 302, Exhibit B, was other than a meticulously correct account of his statement to the FBI. However, the majority opinion finds the following discrepancy between the Form 302 and what the witness Flonnoy told the agent in the interview "The fact that reference to Cleveland police officers' participation in the events of February 8 was deleted from the Flonnoy 302 Report is sufficient evidence that it was not a substitute for the `statement' which was destroyed." (Emphasis supplied.) It is understandable that the extensive and confusing examination of the stenographer, the FBI Agent and the witness Flonnoy could lead to such impression. Careful analysis of the testimony and exhibits persuades me, however, that there was no such deletion. Upon her trial testimony the witness Flonnoy said that upon entering the Gaye home, Gaye had said to an elderly gentleman there, "These men are from the FBI. They are looking for Joe." Upon cross-examination she was asked whether she had told the FBI agent that Gaye's entrance remark was, "These are either Cleveland Police or FBI." She denied making such statement and insisted there was no reference made to the Cleveland police in Gaye's remarks or that she had told the FBI agent so. This put her partly in conflict with the Form 302, Exhibit A, which did report her saying "She heard Gay [sic] tell Mr. FORBES * * * that these men were either police officers or FBI agents * * *." Except as discussed below, there is no evidence that in her interview she made any other reference to police officers, from Cleveland or elsewhere. Defense counsel had available to them for impeachment the witness Flonnoy's above reference to police in the FBI Form 302 report, as against her trial denial that she had ever mentioned police officers. It may be that my brothers' conclusion comes from the following part of the examination of the agent:
 
 
 76
 "Q. Isn't it a fact that in Mrs. Flonnoy's discussion in this matter with you on March 15th at the FBI office she made some reference to the Cleveland Police Department?
 
 
 77
 "A. She did. * * *
 
 
 78
 "Q. Did you delete anything concerning the Cleveland Police Department?
 
 
 79
 "A. I did not." (Emphasis supplied.)
 
 
 80
 Again, careful analysis discloses that Report 302 does contain a reference by Flonnoy to the Cleveland Police Department but in a different context than Gaye's remark on entering the home. It should be noted that the above question put to the agent was not whether Flonnoy had made a reference "to Cleveland police officers' participation in the events of February 8th," (the omission found by the majority) but only whether she had made some reference to the Cleveland Police Department. (Emphasis supplied.) That she had done so is correctly reported in the Form 302.[2] In answer to another question as to whether Mrs. Flonnoy had mentioned Cleveland police officers "being involved" the agent said that she had not. There was testimony from the FBI agent that it was during the interviews, first of Gaye and then Flonnoy, "that it became a matter of concern to me that another law enforcement agency, the Cleveland Police Department, was involved in this incident." He had talked first to Gaye, who not only made reference to police involvement but identified by name two members of the Cleveland police.
 
 
 81
 The closest support for the claim that the FBI agent deleted something from the stenographer's transcript comes from testimony by the FBI stenographer, Ruth Lahetta, who, after having said that the 302 forms contained all that had been said in the interviews, under questioning by the District Judge, said, referring to Exhibit A,
 
 
 82
 "A. I thought I remembered something else that was in there, sir, so I can't say that it is complete.
 
 
 83
 "Q. So we understand you now, relying on your recollection, there were matters in the statement of Mrs. Flonnoy on March 15th, that are not contained in the Court's Exhibit A?
 
 
 84
 * * * * * *
 
 
 85
 "A. They also implicated some police officers, and it is not in here, in Mrs. Flonnoy, and I don't know about Gaye.
 
 
 86
 "Q. In other words, Court's Exhibit A is not a complete account, does not contain all of the subject matter of the Flonnoy statement on March 15th?
 
 
 87
 "A. No, sir."[3]
 
 
 88
 It should be observed that the witness said, "they [Flonnoy and Gaye] also implicated some police officers." It will be recalled that the Flonnoy statement, Exhibit, A, does refer to "police officers" in her account of Gaye's identification of Lonardo and party when they entered Gaye's home. It also shows that she told two of the Lonardo party she thought she had seen them at the Cleveland Police Department. The FBI Report 302 of Gaye's interview, Exhibit B, gave a full account of his recognition and later identification of two Cleveland detectives who appeared during a stop made near a bar on East 21st Street shortly after Flonnoy and Gaye were apprehended. The Flonnoy 302 Report, Exhibit A, also refers to the appearance of two men at this same place, although she apparently did not know they were detectives.[4] The Gaye statement went on to give a detailed account of the seeming cooperation between the Lonardo party and the Cleveland police.
 
 
 89
 I think the District Judge was under a misapprehension when, in denying the defense motion to strike the Gaye and Flonnoy testimony, he remarked "* * Flonnoy has clearly indicated that she mentioned the contact with the City Detectives, which is not in the statement that was produced." Actually, she did not so testify at the trial, and the FBI report does contain her interview statement that she observed the presence of two men whom Gaye identified as detectives. In all events, the District Judge was not impressed that what occurred called for striking the testimony of Flonnoy and Gaye.
 
 
 90
 From my own study of the extended examination of the FBI agent, the FBI stenographer, the witnesses Flonnoy and Gaye, and careful examination of the FBI 302 forms, Exhibits A and B, I am satisfied that the agent's testimony as to the method of conducting the interview and his preparation of the reports is correct and that there were no substantial deletions from the stenographer's transcript of her notes.
 
 
 91
 4) In relating the circumstances of the destruction of the transcription of the stenographer's notes (there were two copies of each transcription given to the agent) my brothers state that "a week and a half before trial of the defendants Agent O'Hara removed the copies of the stenographic transcripts from the file of the United States Attorney * * *" and make reference to "their deliberate destruction by an agent of the United States a week and a half before trial," and further that "the destruction was deliberate; it was on the eve of trial; it was accomplished by the government agent in charge of preparing evidence for the prosecution of the case." (Emphasis supplied.) Some further exploration of the circumstances seems appropriate. The testimony of the agent was that upon receipt of the two copies of the stenographer's transcript of her notes, he made changes on one copy, eliminating the preamble and putting the witnesses' statements into the third person, and delivered such copy to the FBI stenographic pool to be written up on their official Form 302. The other copy was delivered to the office of the United States Attorney. Upon receiving and checking the completed 302 forms, he immediately tore up and threw in the disposal basket the copy of the transcribed notes from which they were prepared. This was done not "on the eve of trial" but about two months prior to trial. He testified that this was in keeping with regulations, and there is no evidence to the contrary. In my view, this was no different than what has been done by lawyers, investigators, and researchers of all kinds in preparing reports of their work. The other copy remained in the United States Attorney's office, along with the official reports of the agent's investigation, until about a week and a half or two weeks before trial. The agent being then at the United States Attorney's office noted that the remaining copy of the transcribed notes was in the file. He took it with him to his own office and tore it up as he had the other copy. There is no evidence that such action was surreptitious or motivated by any purpose of the United States Attorney or the agent to suppress any information. There is nothing in the described circumstances to suggest the "malicious and corrupt" conduct which appellants now charge to the FBI. Asked by defense counsel why he then destroyed the paper, the agent said, "Because the 302 which I submitted in interviewing Gaye and Flonnoy was my official interview of those two individuals. The statement that I tore up was never read to these people or by these people at any time."[5] "At the time this 302 was prepared by me it was substantially, in every way, the same information that was furnished to me by these people in that particular night, and which I dictated to the stenographer and which she transcribed." "The statement [stenographer's transcript] was not given completely in the first person. It was never read to them at the end of the interview, nor did they ever read it, and it was not adopted by them as their signed statement or unsigned statement." He answered a further question as to his reason for tearing up the transcript, which he called rough notes, as follows:
 
 
 92
 "A. Because to me it was not an official record. The only reason they were in existence they were rough drafts that I had a steno type up and send them to me. I sent the thing back down to the steno pool with corrections, and I said I wanted to change it to the FD 302. We had already decided not to make it a signed statement. The same thing applied to Mr. Gaye when I talked to him. The only reason those other two copies were in McCurdy's office was because he had nothing on the case at that time, and he understood when it was brought over at that time it was not a record."
 
 
 93
 All of this detailed discussion, it could properly be said, is much ado about very little.[6] Little indeed, in my view, to justify the majority's rigid rule which, regardless of the circumstances, would leave no discretion in the District Judge. As stated above, it is included so I may better expose my reasons for believing that the District Judge's discretion was properly exercised. His own investigation of the circumstances surrounding the interviews and the statements of the witnesses followed the procedure suggested in Campbell v. United States, 365 U.S. 85, 81 S.Ct. 421, 5 L.Ed.2d 428 (1961). After his own investigation of the circumstances of the destruction of the stenographer's transcripts, he allowed defense attorneys to examine the FBI agent on the subject in the presence of the jury. This they did at length. The judge explained the purpose of the examination to the jury, and in his instructions called the jury's attention to the provisions of the Jencks Act and continued as follows:
 
 
 94
 "At the time the inquiry into this subject matter was concluded, the Court explained the purpose of the inquiry. At this time I wish to qualify that explanation, and I now instruct you that the destruction by the special agent of the Federal Bureau of Investigation of the typewritten transcript of the statements made by the witnesses Gaye and Flonnoy permits you to draw the inference that the documents destroyed contained matters which were unfavorable to the Government in the prosecution of this case. I say to you that it permits you to draw this inference. It does not compel you to draw this inference. That is the reason I permitted you to hear the officer testify on this subject, and it is for you to determine whether or not you will draw such an inference or not."
 
 
 95
 My view that the handling of the situation was a matter for the District Judge's discretion finds support in decided cases. The importance of relying on the district judge to properly enforce the provisions of the Jencks Act by determining whether requested records are "statements" within the meaning of § 3500(e) is emphasized by the opinions in Palermo v. United States, 360 U.S. 343, 79 S.Ct. 1217, 3 L.Ed.2d 1287 (1959). Mr. Justice Frankfurter there said, "[f]inal decision as to production must rest, as it does so very often in procedural and evidentiary matters, within the good sense and experience of the district judge guided by the standards we have outlined, and subject to the appropriately limited review of appellate courts."
 
 
 96
 And concurring in the same case, Mr. Justice Brennan observed,
 
 
 97
 "We of this Court, removed as we are from the tournament of trials, must be careful to guard against promulgating general pronouncements which prevent the trial judges from exercising their traditional responsibility. The Court's opinion well observes that the hope for a fair administration of the statute rests in the final analysis with its responsible application in the federal trial courts. This responsibility of the federal trial judge, it goes without saying, is not to be delegated to the prosecutor." 360 U.S. 360-361, 79 S.Ct. 1228.
 
 
 98
 I believe we must similarly place primary reliance on the district judge to assess the circumstances in which otherwise producible statements have been destroyed, and determine appropriate sanctions, if any. The refusal of the District Judge in the present case to find that the transcripts were destroyed in bad faith is a finding of fact which will not be disturbed, unless clearly erroneous. Cf. Campbell v. United States, 373 U.S. 487, 493, 83 S.Ct. 1356, 10 L.Ed.2d 501 (1963); Palermo v. United States, 360 U.S. 343, 353, 79 S.Ct. 1217, 3 L.Ed.2d 1287 (1959); Killian v. United States, 368 U.S. 231, 242, 82 S.Ct. 302, 7 L.Ed.2d 256 (1961); United States v. Gosser, 339 F.2d 102, 113 (C.A.6, 1964); Williams v. United States, 338 F.2d 286, 289 (C.A. D.C.1964).
 
 
 99
 The rule announced by my brothers that they "see no need to characterize the destruction of these statements as in good faith or bad — as honest or corrupt" and that upon failure to produce them the striking of the witnesses' testimony or a mistrial is called for is in conflict with statements in several decided cases. In Killian v. United States, 368 U.S. 231, 242, 82 S.Ct. 302, 308, the Supreme Court said,
 
 
 100
 "If the agents' notes * * * were destroyed by the agents in good faith and in accord with their normal practice, it would be clear that their destruction did not constitute an impermissible destruction of evidence nor deprive petitioner of any right. Those are the factual representations made by the Solicitor General. Whether they are true can be determined only upon a hearing in the District Court.
 
 
 101
 "It is entirely clear that petitioner would not be entitled to a new trial because of the nonproduction of the agents' notes if those notes were so destroyed and not in existence at the time of the trial." (Emphasis supplied.)
 
 
 102
 In concurring in part in the result in Campbell v. United States, 365 U.S. 85, 102, 81 S.Ct. 421, 430 (1961), Justice Frankfurter said,
 
 
 103
 "Nothing in the legislative history of the Act remotely suggests that Congress' intent was to require the Government, with penalizing consequences, to preserve all records and notes taken during the countless interviews that are connected with criminal investigation by the various branches of the Government.
 
 
 104
 * * * * * *
 
 
 105
 "Petitioners' contention that the words `in the possession of' must be interpreted as meaning `possession at any prior or present time' must be rejected. Congress surely did not intend to initiate a game of chance whereby the admission of a witness' testimony is made to depend upon a file clerk's accuracy or care. Senator O'Mahoney, the sponsor of the bill, in illustrating that his measure approved the essential basis of the Jencks case, interpreted Jencks to apply only where the Government `had at the same time in its files a statement' pertinent to a witness' testimony." (Emphasis supplied.)
 
 
 106
 Justice Frankfurter's observations, concurred in by three other Justices, were not at odds with anything said in the majority opinion. See 365 U.S. 98, 81 S.Ct. 428. Having in mind that the sanctions to be imposed under § 3500 (d) arise where the government elects not to produce statements "in the possession of the United States," § 3500(b), the Second Circuit in United States v. Greco, 298 F.2d 247, 250 (C.A.2, 1962), cert. denied, 369 U.S. 820, 82 S.Ct. 831, 7 L.Ed.2d 785 (1962), said,
 
 
 107
 "Congress, in using the words `possession' and `elects not to comply, clearly was not addressing itself to non-existent notes. Nor is there any legislative requirement that all notes be preserved after transcriptions have been made and checked for accuracy." (Emphasis supplied.)
 
 
 108
 See also United States v. Thomas, 282 F.2d 191, 193-195 (C.A.2, 1960) and N. Sims Organ & Co. v. S. E. C., 293 F.2d 78, 81 (C.A.2, 1961), cert. denied, 368 U.S. 968, 82 S.Ct. 440, 7 L.Ed.2d 396 (1962); United States v. Aviles, 337 F. 2d 552 (C.A.2, 1964); United States v. Spatuzza, 331 F.2d 214 (C.A.7, 1964), cert. denied, 379 U.S. 829, 85 S.Ct. 58, 13 L.Ed.2d 38; Ogden v. United States, 323 F.2d 818 (C.A.9, 1963), cert. denied, 376 U.S. 973, 84 S.Ct. 1137, 12 L.Ed.2d 86. My brothers cite no authorities for their position, but mention a footnote to the second Campbell opinion, 373 U.S. 491, n. 5, 83 S.Ct. 1356 where it is perhaps implied that the Supreme Court had not yet reached the question whether good faith destruction of notes makes inappropriate the imposition of § 3500(d) sanctions. The First Circuit had so held in denying rehearing of Campbell, Campbell v. United States, 303 F.2d 747, 751 (C.A.1, 1962).
 
 
 109
 I think it appropriate to conclude by emphasizing that the Jencks Act here relied upon was not passed to provide persons accused of crime with a new opportunity to assert a technical error in the procedures of law enforcement as a complete bar to conviction. The Jencks Act was Congress' hurried effort to limit the wide exposure of Government files that could be the consequence of the Supreme Court's decision in Jencks v. United States, 353 U.S. 657, 77 S.Ct. 1007, 1 L.Ed.2d 1103 (1957). Notwithstanding the excitement which followed the Jencks decision, it did not announce any revolutionary change in criminal practice, but confirmed a practice which had always considered that it was fair play to allow an accused access to earlier statements made by prosecution witnesses for use as impeachment on cross-examination. Experienced advocates have always been aware of the value of access to pretrial statements of a witness whom they seek to impeach. Various means have been employed by skillful lawyers in both civil and criminal cases to serve this end. And many feel that no greater aid to discrediting a witness' testimony can be found than evidence that a statement or transcript thereof, made at a time when the witness' recollection would likely be more reliable, had been destroyed by the witness or by someone offering his testimony at trial. Research, however, discloses no case before or since the Jencks decision holding that such destruction calls for striking the witness' testimony. Certainly Jencks did not so hold. In Jencks the Court merely held that statements previously made by government witnesses to the FBI and then in the government's possession had to be produced for inspection by defense counsel without requiring that counsel show in advance that such statements were, or might be, inconsistent with the court testimony of such witness. There were other aspects to the decision not necessary to discuss here. The government resisted production of the statements without a preliminary showing of inconsistency, fearing that the broad rule requested would require it to expose important confidential results of its agencies' investigations. The Court held,
 
 
 110
 "that the criminal action must be dismissed when the Government, on the ground of privilege, elects not to comply with an order to produce, for the accused's inspection and for admission in evidence, relevant statements or reports in its possession of of government witnesses. * * *" 353 U.S. 672, 77 S.Ct. 1015, 1 L.Ed. 2d 1114. (Emphasis supplied.)
 
 
 111
 Congress, concerned with the possible impairment of the national security by broad exposure of confidential information under Jencks, moved rapidly to provide safeguards by adoption of the so-called Jencks Act. It is quite clear that this Act was restrictive and did not by its words or Congressional intent provide new procedural devices to escape from criminal convictions. This, in my view, is so unless it is now proper for us to read into it something that is not there. In the context of this decision its language is clear and limits the imposition of its sanctions to cases where the government elects not to produce statements "in the possession of the United States," 18 U.S.C.A. § 3500(b). (Emphasis supplied.)
 
 
 112
 In the case at bar, the District Judge found as a fact, and I assume as a matter of law, that both the destroyed transcripts of notes and all of the 302 Forms were Jencks Act statements. He required that the government deliver to defense counsel all of its 302 Forms, including those made from pencil notes taken by FBI agents throughout their investigation. Whatever inconsistency there was between Flonnoy's interview statements and her court testimony was clearly brought out. In addition, the District Judge allowed counsel to fully explore by cross-examination the circumstances of the destruction by a government agent of material that might otherwise be available to defense counsel and thereby to enjoy whatever implications arose therefrom. The District Judge added to that his instruction that from what occurred the jury could infer that the missing statements "contained matters [which were] unfavorable to the government." The testimony of the stenographer who took the notes, the testimony of the FBI agent, and the testimony of the witnesses Flonnoy and Gaye that the 302 Forms accurately reflected what was said forbids me, as it did the Second Circuit in a like situation described in United States v. Greco, supra, from assuming that in the destroyed papers "there must have been a veritable gold mine of cross-examination material," 298 F.2d 249. I believe that the District Judge's conduct was judicially discreet and that defense counsel really got more "mileage" out of the events discussed than would have been afforded had the destroyed transcripts been preserved and produced.
 
 
 113
 The majority suggests that the testimony of Gaye may escape Jencks Act interdiction if upon remand it is found that the 302 report on him contains "`the very same information' to which they [defendants] were entitled." I am not sure that I understand just what is meant by "the very same information," but I believe that whatever it means it provides no basis for distinguishing between the testimony of Gaye and Flonnoy. If "the very same information" means material having the very same impeaching utility, only carbon, photographic, or other exact copies of the destroyed material would qualify and Gaye's testimony too should be stricken. But if "the very same information" is intended to include situations where the contents of the destroyed notes may be established by the living testimony of witnesses, it has been shown here that the 302 reports actually produced contained "the very same information" as both sets of destroyed notes. The FBI agent, the FBI stenographer, and Gaye himself so testified as to Gaye's report, and except for one claim of niggling discrepancy, the FBI 302 report on Flonnoy was, by agent O'Hara, Flonnoy, and the FBI Stenographer Lahetta, also verified as containing "the very same information" as the stenographer's notes. I have reviewed above the one statement by Lahetta that "they [referring to Flonnoy and Gaye] also implicated some police officers, and it is not in here, in Mrs. Flonnoy, and I don't know about Gaye." This statement was made by Lahetta after she had already testified that Exhibit A (the 302 report on Flonnoy) corresponded accurately with her "transcribed notes." From all of this and notwithstanding his hereinabove referred to misapprehension that Flonnoy "has clearly indicated that she mentioned the contact with the City Detectives," the District Judge refused to strike the testimony of Gaye and Flonnoy.
 
 
 114
 I fail to discern the difference between the Gaye and the Flonnoy situations in this regard, and if the destruction of the stenographic notes calls for imposing the Jencks sanctions as to Flonnoy, the blow should also fall on Gaye's testimony. Thus would the government be foreclosed from going ahead with any prosecution. It is clear to me that there was just as much proof that the Flonnoy 302 report contained the "very same information" as was in the destroyed notes as there was in relation to Gaye's report, and in all events there was sufficient proof to permit the District Judge to exercise his discretion as he did.
 
 
 115
 Since preparation of the original drafts of the majority opinion in the case at bar and this opinion, our Court has announced its opinion in the case of United States v. Hoffa et al., 349 F.2d 20 (C.A.6, 1965). FBI agents there took notes in both longhand and shorthand of interviews with two witnesses and subsequently destroyed the notes after incorporating their substance in formal statements and reports. The District Judge ruled that such destruction did not call for imposition of the Jencks Act sanctions and this Court affirmed. My brothers find their opinion here not inconsistent with Hoffa because of their view that in Hoffa this Court affirmed on the basis of a ruling by the District Judge that the destroyed notes "were not in the circumstances there involved Jencks Act statements." While it might be inferred that the District Judge and this Court were of the view that the destroyed notes in Hoffa were not Jencks Act statements, I do not read either opinion as a clear cut ruling to that effect. Certainly other considerations entered into the refusal to strike the testimony of the involved witnesses. The District Judge ruled that the Jencks Act sanctions need not be employed because
 
 
 116
 "In each instance where a government agent testified to having disposed of his original notes of an interview, the testimony was undisputed that the original notes had been fully and accurately incorporated into the typewritten interview report prepared from the notes before the notes were disposed of."
 
 In affirming, this Court noted that
 
 117
 "The defense had available for impeachment purposes the signed typed statements of both witnesses, and the F.B.I. reports. The typed statements and reports embodied the substance of the interview notes. The agent was not required to preserve his longhand or shorthand notes or other memoranda from which he prepared the witnesses' typewritten statements. There is nothing to suggest bad faith in what the agent did."
 
 
 118
 Earlier in this opinion I have set out the analysis of the testimony which led me to conclude that the FBI 302 reports on Flonnoy and Gaye clearly contained "the substance of the interview notes" and that any possible discrepancies were trifling and insubstantial.
 
 
 119
 Whether or not Hoffa is inconsistent with the majority opinion here, it is not inconsistent with and I cite it to support this opinion.
 
 
 120
 I would affirm.
 
 
 
 Notes:
 
 
 [1]
 Mrs. Flonnoy testified that she had seen the stenographer's transcript, and that "the information on Court's Exhibit A is the same as what is on this other statement, and I can tell because I know there are certain points I checked as I go along."
 
 
 [2]
 The 302 Report of Flonnoy's interview contains the following: "While they were at Gaye's house, Flonnoy mentioned to Pete and the other individual that she thought that she had seen them at theCleveland Police Department and they told her they doubted it."
 
 
 [3]
 Miss Lahetta had earlier concluded as follows:
 "Q. That what is contained in Exhibit A [Form 302 re Flonnoy] is what Mrs. Flonnoy said on March 15th?
 "A. Yes, sir. * * * It seems to be the full and complete statement that she gave.
 "Q. * * * I am concerned with whether Exhibit A corresponds accurately with your transcribed notes that you turned over to the officers?
 "A. Yes."
 
 
 [4]
 "Flonnoy stated that they drove from behind the County Jail up East 21st Street and stopped near a bar on the east side of the street north of Superior Avenue. She stated that the `chief' [Lonardo] got out of the car and she observed two more men appear from somewhere and they talked to the `chief'." (Exhibit A.) Lonardo was addressed by his companions as "chief" during the simulated FBI capture and restraint of Gaye and Flonnoy
 
 
 [5]
 The witness Flonnoy was of the opinion that while at the District Attorney's office she did look over the copy of the stenographer's transcript. That could be because such copy remained in the District Attorney's files for about two months
 
 
 [6]
 This case, in my view, does not present a factual basis out of which to fashion the drastic rule announced by my brothers. The alleged discrepancy in the FBI 302 report on the Flonnoy interview has to do with the apparent condonation and possible cooperation by Cleveland police officers in the colorful capture and inquisition of Flonnoy and Gaye. The FBI 302 report of the Gaye interview sets out at length his account of the activities of the Cleveland police in the day's events. In its 302 report on the Flonnoy interview the FBI recorded that she had referred to "police officers," to the "Cleveland Police Department," and told of the arrival on the scene of "two more men" at the same time and place at which Gaye said that two identified Cleveland detectives appeared. At trial, Flonnoy repeatedly denied that Gaye had told one Forbes that defendants "are either Cleveland Police or FBI," and testified that "At no time was I under the impression, nor Mr. Gaye, that these men were from the Cleveland Police Department." The FBI 302 report provided ready impeachment of her on the point of what Gaye had told ForbesThis discrepancy was not between what she told the FBI and their report of it, but between the FBI report and Flonnoy's trial testimony. Whatever support the police activities gave to the defense was readily accorded by the FBI 302 reports on Gaye and Flonnoy and provided material for impeachment of Flonnoy.